IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHAEL GRAHAM | ) Case No. 1:06-cv-1532 |
| | ) |
| *Plaintiff,* | ) Judge Sara E. Lioi |
| | ) |
| -vs- | ) **PLAINTIFF GRAHAM'S** |
| | ) **BRIEF IN OPPOSITION TO** |
| BEST BUY STORES, L.P., *et al.* | ) **DEFENDANT BEST BUY'S** |
| | ) **MOTION FOR SUMMARY** |
| *Defendants.* | ) **JUDGMENT** |
| _____ | ) |

Now comes Plaintiff Michael Graham, by and through counsel, and asks the Court to deny

Best Buy's Motion for Summary Judgment, for the reasons set forth in the attached Brief in

Opposition.

Respectfully submitted,


   /s/ Kami D. Rowles
KAMI D. ROWLES #0071030
NANCY C. SCHUSTER #0020690
The Bevelin House
2913 Clinton Avenue
Cleveland, Ohio 44113
(216) 348-1100 (Telephone)
(216) 348-0013 (Facsimile)
ss@apk.net (e-mail)

*Counsel for Plaintiff*

1

**BRIEF IN OPPOSITION**

I.　　**INTRODUCTION**

　　　　In deposition, Michael Graham, an African-American male, described his relationship with Best Buy as one in which he was tolerated as long as he remained compliant and uncomplaining. (Ex. A, Graham Depo, pgs. 107-8, 129-30). After his complaints about discriminatory treatment of African-Americans, he was terminated for allegedly violating an employee discount policy. Mr. Graham thereafter filed a complaint with the Ohio Civil Rights Commission regarding his termination. The same individuals who terminated Mr. Graham, including his supervisor, identified him as the perpetrator of a theft at a Best Buy store, and Mr. Graham suffered criminal prosecution for a year before all charges were dropped.

　　　　Best Buy now moves for summary judgment and supports its motion by mischaracterizing facts, omitting record evidence, using inadmissible hearsay, and misstating the law. As set forth more fully below, Best Buy is not entitled to summary judgment because real and material issues remain to be determined by the trier of fact.

II.　　**FACTUAL BACKGROUND**

　　　　A.　　**Mr. Graham's background and his career at Best Buy**

　　　　Michael Graham is 28 years old. He is an African-American male, the son of a career retired Marine Sergeant, and the father of a son age 9 and a daughter age 1. He graduated from the Kubasaki High School in Okinawa, Japan in 1996 (Exhibit B, Graham Dec.) and was hired by Best Buy in 1997 as a Products Specialist in West Palm Beach, Florida (Ex. A, Graham Depo, pg. 25, Ex. B, Graham Dec.). Over the next six years, Mr. Graham worked for various Best Buy stores. (Ex. A, Graham Depo, pgs. 31-37; Ex. C, Rowles Affidavit).

　　　　B.　　**Mr. Graham begins working for Best Buy at its Mayfield Store in June 2004**

　　　　In June 2004, Mr. Graham was working at Blockbuster when he learned of an opening for a Tech Senior in the Mayfield store. Mr. Rankin, with whom he had worked at a Best Buy in Indiana, was the Manager. Mr. Graham applied and was hired on June 27, 2004. In August 2004, Mr. Rankin was made General Manager of Best Buy's new Macedonia store. Mr. Graham applied for and was hired as the PC (Personal Computer) Area Manager on August 15, 2004. (Ex. A, Graham Depo, pgs. 50-2, 58).

2

As PC Area Manager, Mr. Graham supervised approximately 20 (18 white and 2 African-American), including Nicholas LoCascio and Andrew DiGennero. (Ex. A, Graham Depo, pg. 68; Ex. B, Graham Dec.). Approximately 1 month before his termination in March 2005, Mr. Graham disciplined Mr. LoCascio at least twice for performance issues and had conversations with Mr. DiGennero about his rude demeanor towards staff. Although Mr. Graham was his immediate supervisor, Mr. DiGennero refused to follow Mr. Graham's directives until discussed with and approved by Mr. Rankin. (Ex. A, Graham Depo, pgs. 73-4).

### C. Mr. Graham observes several instances of discriminatory conduct which he brings to the attention Mr. Rankin

Almost immediately, Mr. Graham began to observe that African-American customers and employees were being treated differently and less well than others.

*1. Hiring Decisions*

Before the Macedonia store opened, Mr. Rankin assisted by Mr. Graham and other members of the "management team" interviewed prospective employees. An African-American male interviewed for a position as a "Senior" in the Home Theater Department. Although Mr. Graham believed him to be well-qualified and a good fit, Mr. Rankin refused to hire him because, as he termed it, he was not a "go-getter". Mr. Rankin hired Mr. DiGennero for the position. (Ex. A, Graham Depo, pg. 80). Unlike this instance, Mr. Rankin had provided tangible reasons as to why they should not be hired, such as lack of experience or poor communication skills. (Ex. A, Graham Depo, pgs. 78-80, 135-6, 138).

Around November 2004, African-American male Terrance Williams interviewed for a position as a car radio installer. Mr. Rankin declined to hire him because he lacked a high school diploma, but promised to hold a position for him until he got his diploma, without any time limitaton. When Mr. Williams returned in two weeks with his GED, Mr. Rankin hired him as a sales associate (a lower paid position), this time because he did not have a certification to work with car electronics. A white male without certification was hired and working as a car radio installer. After Mr. Williams complained, his hours were reduced from 30-35 hours to 5-6 hours a week. In December 2004, Mr. Graham spoke with Mr. Rankin about re-assigning Mr. Williams to car radio installation and improving his hours, but Mr. Rankin's response was that he was the "GM" and could do what he chose to. (Ex. A, Graham Depo, pgs. 84-5, 146-151).

3

Around that same time, Mr. Williams' girlfriend, a qualified African-American female, inquired about a position at Best Buy. Mr. Graham spoke with Mr. Rankin about hiring her. Mr. Rankin refused to accept an application, stating that he does not hire couples. In February 2005, Mr. Rankin hired a white male who was the boyfriend of a white female employee already working in the store's Media department. (Ex. A, Graham Depo, pgs. 85-6; Ex. B, Graham Dec.).

*2. Reducing African-American Employees' Work Hours*

In addition to Mr. Williams, Mr. Rankin reduced the work hours of African-American male Anthony Lewis. Mr. Lewis was hired to work in TV department based on his previous experience but was placed by Mr. Rankin in cell phones where he had no experience. Near the beginning of February 2005, when Mr. Rankin mentioned that he wanted to fire Mr. Lewis, Mr. Graham suggested that Mr. Lewis be given appropriate training. Mr. Lewis' hours were reduced. (Ex. A, Graham Depo, pgs. 125-6; Ex. B, Graham Dec.). Mr. Graham also discussed with Mr. Rankin the reduction of hours of two, African-American Customer Service employees, Kapree Harrell and Jonita Hicks. (Ex. A, Graham Depo, pg. 124; Ex B, Graham Dec.). From June 2004 to April 2005 while Mr. Graham worked at the Macedonia store, Mr. Rankin never reduced the hours of a white employee. (Ex. A, Graham Depo, pg. 126).

*3. Discriminatory Conduct Toward African-American Customers*

On April 12, 2005, 10 days before Mr. Graham's termination, an Afridan-American male inquired about the return of a TV. Mr. DiGennero was instructed by Mr. Rankin to charge him a 15% "restocking fee". Since it was not Best Buy policy to charge for restocking TV's, after confirming the policy with Stacey Vyas, District Manager for Human Resources, Mr. Graham corrected Mr. DiGennero.[1] On April 19th, 3 days before his termination, after the TV had been picked up from the customer's house, Mr. Graham handled the return himself and did not charge a restocking fee. (Ex. A, Graham Depo, pgs. 86-8, 91-2; Ex. B of Graham Dec.).

*4.     Discriminatory conduct toward Mr. Graham*

In September 2004, Mr. Graham asked Mr. Rankin for permission to leave work prior to the end of his shift to take his girlfriend to the hospital due to complications in her pregnancy.  In front of other management and staff, Mr. Rankin stated that he did not bring Mr. Graham to Ohio to be a "jiggilo" and impregnate somebody and that his responsibilities were at work. Mr. Graham

---

[1]     Ms. Vyas testified in deposition that a restocking fee may be charged something is missing from the returned merchandise, *i.e.,* missing remote or manual. (Ex. D, Vyas Depo, pg. 74).

4

left, but was required to make up the time. When a white manager, Todd Sklarek, requested permission to leave work early to close on his house, he was permitted to do so without making up the hours. (Ex. A, Graham Depo, pgs. 82-84).

Mr. Sklarek also continually made inappropriate comments to Mr. Graham about African-American females that entered the store, saying "the sisters are always thick" or asking him if that "is too much butt for you". (Ex. A, Graham Depo, pg. 155).

### D. On April 22, 2005, Mr. Graham is terminated for allegedly violating an employee discount policy

During the week of April 17-30, 2005, the Macedonia store ran an "employee accommodation" which gave employees 30% off the price of "any closeout or open-box desktop, notebook, monitor or projector". The procedure was described in a flyer. (Ex. 1, Employee Accommodation Flyer of Rowles Aff.). The discount was to be "taken manually after the employee price is entered". The employee price at Best Buy as the price after applying the regular employee discount on the particular product, or the price advertised to the public, whichever would be less. Closeout and open-box items were always sold to the public at a discount. (Ex. D, Deposition of Stacey Vyas, pgs. 28-9; Ex . A, Graham Depo, pg. 175)[2] . To obtain the special 30% employee accommodation, the employee was required to obtain manager approval. (Ex. 1, Employee Accommodation Flyer of Rowles Aff.).

To take advantage of the additional savings, on Sunday, April 17th, Mr. Graham selected a closeout computer and monitor that were on display. He began to prepare a closeout purchase ticket to be approved by Mr. Rankin as required by the flyer. He listed the computer and monitor with the ticketed retail price for each, the discounted price from the open item sticker,[3] and the price after an additional discount (amounting to 23%) but he didn't complete the ticket.  (Ex. A, Graham Depo, pgs. 100, 163-170).

Mr. DiGennero seeing him prepare the ticket, told Mr. Graham that a computer of the same brand and model was in the back. Mr. Graham asked Mr. DiGennero to get the new, closeout computer and to put the display computer in the box to be sent back to the vendor for a credit. Mr.

_____

[2]        Ms. Vyas testified in deposition that the total discount was to be 30% but admitted that she had no experience with this type of employee accommodation. She could not define an open-box or employee price. (Ex. D, Vyas Depo, pgs. 32-36).
[3]        The price tag provided by Best Buy in discovery shows only the original retail price. An additional sticker was placed over the original price tag to show the discounted price. (Ex. B, Graham Dec.).

Graham then wrote a second purchase ticket to reflect the fact that he was purchasing a new, closeout computer adjusting the price accordingly. He placed the cart near the management office to await Mr. Rankin's approval and called Mr. Rankin to tell him. (Ex. A, Graham Depo, pgs. 100, 163-170). From April 17 until April 22, 2005, the computer with paperwork remained at the front of the store. (Ex. B, Graham Dec.).

On April 22, 2005, Mr. Graham was called to a meeting with Mr. Rankin and Tim Collins. He and Mr. Collins had spoken before when Mr. Collins visited the store on a day that Mr. Graham was in charge and Mr. Collins had chastised Mr. Graham about the appearance of the store. Mr. Graham thought the meeting was going to be about problems in the store which he had mentioned to Mr. Rankin including claims of sexual harassment against Wayne Jones, an African-American. (Ex. B, Graham Dec.).

The meeting began with Mr. Collins explanation of his position with loss prevention. He questioned Mr. Graham about the computer and monitor he had set aside and accused Mr. Graham of switching the "license plates" between the display and the new computer so that he could convince Mr. Rankin to sell it for a bigger discount.[4] (Ex. E, Collins Depo, pg. 265).

Mr. Graham was terminated at the meeting without required input from Human Resources. (Ex. D, Vyas Depo, pgs. 49-50).[5]

### E.    Mr. Rankin and Mr. Collins, who previously terminated Mr. Graham, falsely identified Mr. Graham as the perpetrator of an alleged theft at Best Buy's Elyria Store

After his termination, Mr. Graham contacted Ms. Vyas to grieve his termination. Although she conducted no additional investigation than that reported by Mr. Collins and Mr. Rankin,  Ms. Vyas agreed with the determination of Mr. Rankin and Mr. Collins that Mr. Graham had violated Best Buy's policy on employee discounts. (Ex. D, Vyas Depo, pgs. 93-4). Mr. Graham also filed a charge of discrimination with the OCRC. (Ex. C of Rowles Aff.).

On May 9, 2005, the Best Buy store located in Elyria experienced a cash shortage of $667.00. Mr. Collins conducted the following investigation: (1) he viewed the surveillance video;

---

[4]        This is impossible since "license plates" exist on open items, shelf displays, defective equipment, and "junkouts". (Ex. C, Rowles Aff.; Ex. B, Graham Dec.).

[5]        Although Mr. Collins attests in his affidavit that Ms. Vyas approved the termination, Ms. Vyas testified in deposition that she does not remember personally speaking with anyone about Mr. Graham prior to his termination. Plaintiff has moved to strike Mr. Collins' statements as hearsay.

(2) he showed the video to Marc Rankin, told him that he had deduced that there had been a theft and that Mr. Graham had done it and asked Mr. Rankin whether he agreed that the man in the video looked like Mr. Graham; (3) he asked Mr. Rankin for photographs of Mr. Graham and obtained three photographs: one showing a white person and an African-American male with glasses from the rear, one showing two white cardboard figures and a black male, and one showing a group at a party containing three white males and females and two African-American males[6] ; (4) without asking for any description, he showed the three photographs to Elyria assistant manager Rick Sulenski who had "assisted" a black male in the store earlier that day before, although Mr. Collins told the Elyria Police Department that Mr. Sulenski positively identified Mr. Graham, however, Mr. Sulenski testified that he identified no one; and (5) he looked at the area of the Elyria store in which the suspect cash register was located. Although Mr. Collins testified that he always made notes of his investigations, he made no notes or reports to management regarding this investigation. (Ex. E, Collins' Depo, pgs. 114, 193, 210, 213)[7] . He suspected Mr. Graham and deduced that he was the thief because Mr. Graham is black, he would have had access to register keys, a former employee would have known that the register had a lot of cash, and he did not work at other stores which had been robbed. On this basis, he called the Elyria Police Department and told them that there had been a theft and Mr. Graham had done it. (Ex. E, Collins Depo, pgs. 173-4). The only evidence presented to the Grand Jury was that found by Mr. Collins. (Ex. G, Gauthier Depo, pg. 102).

Mr. Collins surmised that the perpetrator must by Mr. Graham because the register was opened with a key and Mr. Graham could have had a key. However, Mr. Sulenski, who was the manager on duty, inspected the register the evening of May 9th and found that the key cylinder had been damaged and that the register had been "marked up, scratched and dented", which he told Mr. Collins. No steps were taken to preserve the condition of the register. (Ex. H, Deposition of

---

[6]     The photos are attached as Exhibits F1-F3, authenticated by Mr. Collins at pg. 199 of his deposition.

[7]     Mr. Collins also testified that notes made regarding his investigation of the theft, if any, would have been given to the Elyria Police Department. (Ex. E, Collins Depo, pg. 193, 210, 213). No handwritten notes made by Mr. Collins were located by the Elyria Police Department after a Public Records Request under O.R.C. 149.43. (Ex. C, Rowles Aff.).

Richard Sulenski, pgs. 128-9).[8]  Further, Best Buy has produced no reports showing that any register keys were missing after Mr. Graham was terminated. (Ex. G, Gauthier Depo, pgs. 38-9, 106).

While other thefts had been occurring at other Best Buy stores, the only description of the alleged perpetrator was a "well-dressed African-American male". (Ex. E, Collins Depo, pg. 191).

Based entirely on Best Buy's "investigation" Mr. Graham was arrested by the Elyria Police Department on June 15, 2005 for theft, violation of O.R.C. 2913.02(A)(5), a fifth degree felony and indicted. (Ex. G, Gauthier Depo, pgs. 78-9, 102). Indeed, the only evidence presented to the Grand Jury was that provided by Mr. Collins. (Ex. G, Gauthier Depo, pgs. 173-4, 199).

> **G.** **The Lorain County Prosecutor drops all charges against Mr. Graham**

On May 9, 2006, Lorain County dropped all charges against Mr. Graham.

## III.  PROCEDURAL BACKGROUND

On May 9, 2006 Mr. Graham sued Best Buy in the Lorain County Court of Common Pleas for defamation. That case was  removed by Best Buy to the Northern District of Ohio and assigned to the Honorable Christopher A. Boyko. On August 30, 2006, Mr. Graham filed a  Complaint against Best Buy for racial discrimination and retaliation under the Civil Rights Act of 1964, sect. 701 *et seq.*, as amended, 42 U.S.C. sect. 2000e *et seq.*, and Ohio Revised Code sect. 4112.01 *et seq.*, wrongful discharge, abuse of process, malicious prosecution, intentional infliction of emotional distress, and punitive damages under O.R.C. 2315.21. The cases were consolidated on  April 10. 2007 and transferred on March 26, 2007.

Best Buy moved for summary judgment on June 25, 2007 with Mr. Graham's response due July 25, 2007

## IV.  LAW AND ARGUMENT

> **A.** **Summary Judgment Standard**

Under Fed. Civ. R. 56, summary judgment is proper only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. A moving party is entitled to judgment as a matter of law only if  "the nonmoving party has failed to make a

---

[8]      Although Mr. Collins attests that Mr. Sulenski identified Mr. Graham from a photo array as an individual with whom he talked earlier that day at the Elryia store, Mr. Collins' testimony constitutes hearsay as set out in Plaintiff's Motion to Strike, and Mr. Sulenski testified in deposition that he did not recognize any of the photos provided to the Elyria Police by Mr. Collins as the ones shown to him by Mr. Collins. (Ex. H, Sulenski Depo, pgs. 136-139). Further, the only description that he gave of the person he talked to was an African-American male between the age of a teenager and 55 years old. (Ex. H, Sulenski Depo, pg. 144).

sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The opponent must only present "specific facts showing that there is a genuine issue for trial"; he is not required to conclusively prove the existence of the facts that he asserts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-9 (1986), citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-9 (1968). An issue of material fact exists when there is a dispute over facts that might affect the outcome of a suit under the governing law. *Anderson,* 477 U.S. at 248.

In considering a motion for summary judgment, the Court must view the evidence in the light which is the most favorable to the nonmoving party by accepting all of his evidence as true and drawing all reasonable inferences in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Anderson,* 477 U.S. at 247. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions. . . . The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Id.* at 251-2.

### B.    Mr. Graham can establish a prima facie case of race discrimination

42 U.S.C. 2000e-2(a) ("Title VII") provides in pertinent part:

> It shall be unlawful employment practice for an employer to (1) to fail or refuse to hire, or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

Mr. Graham may prove discrimination by circumstantial evidence using the three-part burden shifting *McDonnell Douglas* framework: (1) Plaintiff must present a prima facie case of discrimination; (2) Defendant must then articulate a legitimate, non-discriminatory reason for the adverse employment action; and (3) Plaintiff must present evidence that Defendant's articulated reason is a pretext. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), as clarified by *Texas Dept. of Comity Affairs v. Burdine,* 450 U.S. 248 (1981).

To establish a prima facie case of racial discrimination, Mr. Graham must present evidence that: (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an

9

adverse employment action; and (4) the circumstances give rise to an inference of discrimination, *i.e*., that similarly situated non-protected employees were treated more favorably or he was replaced by a person outside of the protected class. *Id*.

The burden of establishing a prima facie case is not onerous, but one easily met. *Majewski v. Automatic Data Processing, Inc*., 274 F. 3d 1106, 1114 (6th Cir. 2001); *Nguyen v. City of Cleveland*, 220 F. 3d 559, 563 (6th Cir. 2000); *EEOC v. Avery Dennison Corp*., 104 F. 3d 858, 861 (6th Cir. 1997) (Establishing a prima facie case entails a lower burden of proof than that which is required to win a judgment on the merits.).

Defendant's proffered reason for Plaintiff's termination cannot be considered in determining whether Plaintiff has produced sufficient evidence to provide his prima facie case. *Wexler v. White's Fine Furniture, Inc*., 317 F. 3d 564, 574 (6th Cir. 2003); *Cline v. Catholic Diocese of Toledo*, 206 F. 3d 651, 660-1 (6th Cir. 2000). But if the proffered reason for the action is pretext, the trier of fact may infer that the real reason included discrimination. *Kline v. Tennessee Valley Authority*, 128 F. 3d 337, 347 (6th Cir. 1997).

1. *It is undisputed that Mr. Graham is a member of a protected class and suffered an adverse employment action*

There is no dispute that Mr. Graham is a member of a protected class, *i.e*., an African-American male, and that he suffered an adverse employment action, *i.e*., termination. (Def. Motion, p. 9).

2. *Whether Mr. Graham was qualified involves a factual dispute which can only be resolved by the trier of fact*

Defendant argues that Mr. Graham was not qualified for his position as manager because he represented a new computer as being used and ordered a subordinate to switch the used computer for the new. As detailed in subsection II.D., Mr. Graham refutes Defendant's allegations, and thus, a factual dispute exists.

3. *Mr. Graham was replaced by someone outside his protected class and two similarly situated white male employees were treated better than Mr. Graham*

Defendants argue that Mr. Graham has no evidence that either he was: (1) replaced by someone outside of his protected class; or (2) that someone similarly situated was treated better.

After his termination, Mr. Graham was replaced by a white male named Tim from the

Camera department at the Macedonia store. (Ex. B, Graham Dec.).

For employees to be considered "similarly situated", it must be shown that they: (1) dealt with the same supervisor; and (2) were subject to the same standards and engaged in the same conduct without mitigating circumstances that would differentiate their conduct. *Seay v. TVA*, 339 F.3d 454, 480 (6th Cir. 2003). This standard is not comprised of "inflexible criteria", but instead the Court must make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. *Walker v. Ohio Dept. of Rehab. & Corr.*, 2007 U.S. App. LEXIS 16829, *11-12 (6th Cir., July 11, 2007).

Former Best Buy employee Russell Weiser was a white male. Both Mr. Weiser and Mr. Graham dealt with the same supervisor, *i.e.*, Marc Rankin. Both were subject to the same standards found in Best Buy's Employee Handbook and Code of Ethics which apply to "all Best Buy employees". Mr. Weiser was given a verbal warning before being terminated for a second offense of violating Best Buy's Employee Purchase Policy. Mr. Graham was terminated immediately without warning for a single violation. (Ex. B, Graham Dec.; Ex. 3, Rowles Aff.).

**C.    Genuine issues of material fact exist as to whether Best Buy's proffered reason for terminating Mr. Graham is pretext**

Citing *Wexler v. White's Fine Furniture,* Defendant argues that, because Mr. Rankin both hired and fired Mr. Graham, the Court  may use the "same actor inference" to infer a lack of discrimination.

In *Wexler, supra,* however, the Sixth Circuit held that although the fact finder may infer an absence of discrimination where the same individual hired and fired the plaintiff, such an inference is not mandatory and may be weakened by other evidence:

> This . . . approach is more consistent with the requirement that, in considering a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). We therefore reject the idea that a   mandatory inference must be applied in favor of a summary-judgment movant whenever the claimant has been hired and fired by the same individual. Such an approach strikes us as being contrary to the Supreme Court's opinion in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.

11

> The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

*Wexler,* 317 F. 3d at 573.

As detailed above, Mr. Collins and Mr. Rankin together terminated Mr. Graham with Mr. Collins taking the lead, and if he is to be believed, calling Ms. Vyas at Human Resources to recommend termination. Based on Mr. Collins' investigation, Ms. Vyas agreed that allegedly agreed. "When the termination process includes an individual with considerable influence, and that individual was not a participant in the hiring process, the 'actor' in the hiring and in the firing cannot be considered the same." *Abdulnour v. Campbell Soup Supply Co., LLC,* 464 F. Supp. 2d 711, n. 1 (N.D. Ohio 2006).[9]

Defendant also argues that, as long as Best Buy "honestly believed" its reason for termination, Mr. Graham has no claim. For an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. *Balmer v. HCA, Inc.,* 423 F.3d 606, 614 (6th Cir. 2005). Even when the employer makes such a showing, "the protection afforded by the rule is not automatic. . . . [O]nce the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce 'proof to the contrary.'" *Pesterfield v. TVA* , 941 F.2d 437, 443 (6th Cir. 1991). Further, under 42 U.S.C. 2000e-2(m), a plaintiff can raise a mixed-motive Title VII claim by "demonstrat[ing] that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." If the plaintiff makes such a showing, he is entitled to relief. See also *Desert Palace v. Costa,* 539 U.S. 90 (2003).

As articulated above, Mr. Graham has put forth evidence that Best Buy could not have reasonably relied on the facts before it to terminate him. Even so, geniune issues of material fact exist as to whether Mr. Graham's race was a motivating factor for his termination.

### D.    Mr. Graham can establish a prima facie case of retaliation

42 U.S.C. 2000e-3(a) provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful practice made an unlawful

---

[9]     Defendant also makes much of the fact that Mr. Graham allegedly "lived" with Mr. Rankin when he moved to Ohio. This is not the case. Mr. Graham stayed with Mr. Rankin "for a few days" when he first arrived in Ohio. (Ex. A, Graham Depo, pgs. 54-55).

practice under this title [42 U.S.C. 2000e-2000e-17] . . . .

Mr. Graham can also prove retaliation through circumstantial evidence using the *McDonnell Douglas* framework. *Abbott v. Crown Motor Co.*, 348 F. 3d 537 (6th Cir. 2003). The elements of retaliation are: (1) Plaintiff was engaged in opposing discriminatory practices, a protected activity; (2) Defendant knew of the protected activity; (3) Defendant took an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Randolph v. Ohio Dept. of Youth Services,* 453 F. 3d 724 (6th Cir. 2006); *Smith v. City of Salem, et al.*, 378 F. 3d 566, 570 (6th Cir. 2004), citing *DiCarlo v. Potter,* 58 F. 3d 408, 420 (6th Cir. 2004). In this instance Defendant's proffered reason for Plaintiff's termination cannot be considered in determining whether Plaintiff presented a prima facie case. *Cline, supra.*

Liability for retaliation does not require that the employment practice which Plaintiff complained about in fact violated Title VII or was unlawful but only that Plaintiff reasonably believed that it was. *Delise v. Brimfield Twp. Police Dept.*, 94 Fed. Appx. 247, 251 (6th Cir. 2004), citing *Johnson v. University of Cincinnati,* 251 F. 3d 561, 579 (6th Cir. 2000).

    1.    *When he complained bout discrimination, Mr. Graham engaged in protected activity, and there is a causal connection between his complaints and his termination and subsequent arrest and indictment*

    a.    <u>Mr. Graham was terminated because he complained to Best Buy management about its discriminatory conduct</u>

As outlined in subsection II.C, Mr. Graham made multiple complaints of discriminatory conduct by Best Buy, including its conduct against African-American customers.

But Defendant argues that the only discriminatory conduct complained of by Mr. Graham is Mr. Rankin's attempt to charge an African-American customer a restocking fee and that discrimination against customers is not an unlawful employment practice prohibited by Title VII.

Best Buy misstates the law, citing *Great American Federal Sav. & Loan Assn. v. Novotny,* 442 U.S. 366, 388 (1979) in support of its argument. The part of the decision cited by Defendant is however, Justice White's dissent. Best Buy cites to no case law which holds that an employee who is retaliated against for complaining to management about its discriminatory conduct toward customers has not engaged in protected activity.

Defendant argues also that, even if he can show that he engaged in protected activity, Mr. Graham cannot show a causal connection between his protected activity and his termination. As

13

cited by Defendant, the Sixth Circuit in *Dixon v. Gonzales,* 481 F. 3d 324 (6th Cir. 2007), held that, the burden of proof to establish a causal connection is minimal requiring only some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action. *Id*. at 333, citing *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997).

Proof of temporal proximity between the protected activity and the adverse employment action, coupled with other indicia of retaliatory conduct, can give rise to a finding of a causal connection. *Id*. at 333-4, citing *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 737 (6th Cir. 2006) ("although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection").   Although Best Buy claims otherwise, Mr. Graham was terminated after he discussed with Mr. Rankin his concerns about Mr. Rankin's conduct toward African-Americans and days after he prevented Mr. Rankin from charging an African-American customer an inappropriate restocking fee. As Mr. Graham has also shown, factual disputes exist as to Best Buy's proffered reason for his termination.

        b.    <u>Best Buy accused Mr. Graham of committing an alleged theft at the Elyria Store because of his complaints regarding Best Buy's discriminatory behavior, which he alleged in his OCRC/EEOC charge. Both Mr. Collins and Mr. Rankin knew of his complaints prior to the theft</u>

Best Buy argues that Mr. Graham's claim of retaliation based on his arrest fails because he did not allege it in his OCRC/EEOC charge.  Best Buy fails to note that Mr. Graham amended the charge to include the arrest in December 2005. (Ex. 4, Rowles Aff.). And there is no exhaustion requirement for a claim under O.R.C. 4112. *Harrison v. City of Akron*, 43 Fed. Appx. 903 (6th Cir. 2002); *Elek v. Hunington Nat'l Bank*, 60 Ohio St. 3d 135 (1991); O.R.C. 4112.99.

Defendant argues that Mr. Graham cannot establish a prima facie case of retaliation because he cannot show that when Mr. Collins told the Elyria Police that Mr. Graham had been identified as the thief, he knew of Mr. Graham's complaints about Best Buy's discriminatory conduct.  Mr. Rankin, to whom Mr. Graham made his complaints, and Mr. Collins both were involved in the so-called investigation and the identification of Mr. Graham as a thief, driving together from Macedonia to Chapel Hill and back. Mr. Rankin "verified" Mr. Collins' identification and gave pictures of Mr. Graham to Mr. Collins to show. Mr. Graham also told Mr. Collins during the

14

termination conference that he had made complaints about discriminatory conduct occurring in the Macedonia store.

Additionally, the mixed-motive analysis also applies to retaliation claims. *Mueller v. J.P. Morgan  Chase & Co.,* 2007 U.S. Dist. LEXIS 20828 (N.D. Ohio). Therefore, Mr. Graham has put forth sufficient evidnece to show that Best Buy's retaliation against him *vis-a-vis* his termination and arrest were based at least partly on an impermissible factor.

> **E.    The Ohio Supreme Court has not held that a wrongful discharge claim cannot be based on allegations which also support a claim under O.R.C. 4112, thereby permitting Mr. Graham to make a wrongful discharge claim based on his opposition to Best Buy's discriminatory conduct toward African-American customers**

To establish a claim for wrongful termination, plaintiff must show:

> (1)    existence of a clear public policy manifested in constitutional, statutory, regulatory, or common, law (the *Clarity Element*);
>
> (2)    circumstances of the discharge undermine or jeopardize the public policy (the *Jeopardy Element*);
>
> (3)    discharge was for reasons related to the policy (the *Causation Element*); and
>
> (4)    there was no overriding legitimate basis for the discharge (the *Overriding Justification Element*).

*Krickler v. City of Brooklyn,* 149 Ohio App. 3d 97, 102 (8th App. Dist. 2002), citing *Kulch v. Structural Fibers, Inc.,* 78 Ohio St. 3d 134 (1997).

Defendant argues that, under Ohio law, Plaintiff cannot bring a claim for wrongful discharge because it is "premised upon a public policy enumerated in an anti-discrimination statute" and he cannot prove an underlying statutory claim for discrimination and retaliation.

The Ohio Supreme Court has never addressed whether a wrongful discharge claim fails if based on factual allegations supporting a discrimination or retaliation claim under O.R.C. 4112. *Bukta v. J.C. Penney Co., Inc.,* 359 F. Supp. 2d 649, 674 (N.D. Ohio 2004) (recognizing a claim for wrongful discharge based solely on public policy expressed in O.R.C. 4112 because the Ohio Supreme Court has not held that O.R.C. 4112 provides sufficient relief to an aggrieed employee). But see *Garcia v. Third Fed. S&L Assn. of Cleveland,* 2007 U.S. Dist. LEXIS 30887 (N.D. Ohio 2007) (citing to Sixth Circuit and Ohio appellate court decisions holding that plaintiff cannot bring a wrongful discharge claim based on alleged violations of O.R.C. 4112).

As discussed in subsection II.D.1., Defendant argues that Mr. Graham cannot support a retaliation claim based on his conduct in opposing Best Buy's discriminatory conduct toward African-American customers. Such activity however certainly would support a claim for wrongful termination. As to the Clarity Element, customers may bring discrimination claims under 42 U.S.C. 1981. *Morris v. Office Max*, 89 F. 3d 411 (6th Cir. 1996). This public policy is jeopardized if an employee cannot base a retaliation claim on his activity in protecting customers from discrimination. In this case, genuine issues of material fact exist as to whether Mr. Graham's discharge was related to his activity and whether his termination was legitimate.

**F.    Whether plaintiff has suffered "serious emotional harm" is a question for the trier of fact**

The elements of intentional infliction of emotional distress include: (1) defendant either intended to cause emotional distress or knew or should have known that his actions would result in serious emotional distress; (2) defendant's conduct is so extreme and outrageous as to go beyond all possible bounds of decency and can be considered as utterly intolerable in a civilized community; (3) defendant's action were the proximate cause of plaintiff's psychic injury, and (4) mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it. *Yeager v. Local Union 20, Teamsters*, 6 Ohio St. 3d 369 (1983).

Defendant argues that Mr. Graham has no evidence that Best Buy engaged in any outrageous behavior or that he suffered severe and debilitating emotional injury.

While the questions of whether Defendant's conduct was outrageous and whether it resulting in emotion injury that was more than trifling, mere upset, and hurt feelings are questions of law for the Court, whether the emotional distress actually suffered was serious and debilitating is a question for the jury. *Binns v. Fredendall,* 32 Ohio St. 3d 244, 246 (1987).

Best Buy's actions in reporting to police that it had identified Mr. Graham as a thief based on no investigation and on Mr. Collins' conclusion that the theft must have been perpetrated by a former employee, that the thief was African American, and that it was Mr. Graham because he was an African-American former employee is specious, at least.  His positive identification to police and his statement to them that Mr. Sulenski identified him when he did not are false and should have known that his statements would result in Mr. Graham's arrest and indictment for theft. In *MacDermid v. Discover Fin. Servs.,* 2007 U.S. App. LEXIS 12344 (6th Cir. 2007), the Court

16

reversed the district court's finding that plaintiff's allegation that defendant threatened her with criminal prosecution for a purely civil debt and her subsequent upset supported a claim for intentional infliction of emotional distress. Here, Best Buy did not just threaten criminal prosecution, but followed through. As a result, Mr. Graham "changed as a person" and was continually angry, moody, frustrated, and fearful that he could not find subsequent employment while the criminal case was pending. The fact that Mr. Graham did not seek medical treatment is not fatal to his claim. *Paugh v. Hanks*, 6 Ohio St. 3d 72 (1983).

### G.     Best Buy perpetuated the criminal prosecution of Mr. Graham in order to disable and dissuade him from filing a civil suit

To prove a claim for abuse of process, plaintiff must show: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process. *Robb v. Chagrin Lagoons Yacht Club*, 75 Ohio St. 3d 264, 270 (1996). The validity or invalidity of the issuance of process is immaterial; it is the ulterior or improper purpose for which the process is used which is the basis for abuse of process. *Donohoe v. Burd*, 722 F. Supp. 1507, 1517 (S.D. Ohio 1989).

An "ulterior purpose" is "'a further act in the use of the process not proper in the regular conduct of the proceeding.'" *Kensington Land Co. v. Zelnick*, 95 Ohio Misc. 2d 45, 57 (Miami Cty. Common Pleas Court, 1998), quoting *Clermont Environmental Reclamation Co. v. Hancock*, 16 Ohio App. 3d 9, and *Yaklevich v. Kemp. Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St. 3d 294 (1994). An example of an "ulterior purpose" is found in *Robb*. The Court found sufficient facts to support an abuse of process claim where ex-members of a club had brought suit against the club in order to coerce the club membership to vote in their favor against their suspension, which the trial court had no authority to order under the filed lawsuit.

Defendant confuses the elements of abuse of prosecution and malicious prosecution. The fact that the Grand Jury found probable cause does not affect the Court's analysis for an abuse of process claim. *Bickley v. FMC Technologies, Inc.*, 282 F. Supp. 2d 631 (N.D. Ohio 2003), cited by Defendant, is distinguishable. In *Bickley*, the only role of plaintiff's employer in his criminal prosecution was to make voice identifications. Here, Best Buy conducted the entire investigation which lead to the arrest and indictment. The prosecutor testified that the police role was merely

17

"administerial", that neither he nor they did any further investigation, and that if he had any questions about the case, he would call Mr. Collins and not the Elyria Police. (Ex. G, Gauthier Depo, pg. pgs. 78-9, 102). The only evidence of Best Buy's alleged "good faith" is Mr. Collins' alleged statement testified to by Mr. Gauthier that Mr. Collins would help dismiss the complaint by writing a letter, which is inadmissible. (See Plaintiff's Motion to Strike).

### H.    Malicious Prosecution

The elements of malicious prosecution are: (1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) termination of the prosecution in favor of the criminal defendant. *Trussell v. General Motors Corp.*, 53 Ohio St. 3d 142 (1990).

Defendant argues that Mr. Graham can neither show bad faith nor lack of probable cause. As set out above, in addition to the fact that Best Buy has no documentation of the investigation conducted by Mr. Collins, Mr. Sulenski advised Mr. Collins that the register was in fact damaged, thus putting into doubt that the perpetrator was a former employee with a key, and that keys from any Best Buy store across the country could open the Elyria store register as claimed by Best Buy and Mr. Collins.

A presumption of probable cause may be overcome if the person who provided the information to the prosecutor did not do so in good faith. *Tourlakis v. Beverage Distribs.*, 2002 Ohio App. LEXIS 7088 (8th App. Dist.).

There is ample evidence to create a factual dispute as to whether Best Buy provided information to the Elyria Police in good faith.

### I.    Best Buy defamed Mr. Graham by maliciously identifying him to the Elyria Police and the public and the claimed investigation was so lacking as to constitute actual malice

The elements of defamation are: (1) false and defamatory statement about another; (2) about Plaintiff; (3) published without privilege to a third party; (4) with fault of at least negligence on the part of defendant, and (5) statement either defamatory per se or caused special harm. *Helms v. Fischer Mgmt.*, 2005 U.S. Dist. LEXIS 27259 (S.D. Ohio).

The only element disputed by Best Buy is a claim of qualified privilege to publish information about Mr. Graham to the police. This privilege is overcome by showing of actual malice. To prove actual malice, Plaintiff must show that Defendant acted with either knowledge that the statements were false or with reckless disregard as to their truth or falsity. For reckless

disregard, Plaintiff must show: (1) false statements were made with high degree of awareness of probable falsity, or (2) Defendant entertained serious doubts as to the truth of publication. *Helms v. Fischer Mgmt.*, 2005 U.S. Dist. LEXIS 27259 (S.D. Ohio).

Again, the investigation by Mr. Collins, or lack thereof, was based on assumptions so that the finger could only be pointed at Mr. Graham. Mr. Collins completely ignored the fact that the register from which the cash was missing had been tampered with and the only description of the alleged perpetrator was a "well-dressed African-American male". Mr. Collins told Ms. Vyas of the alleged theft. (Ex. D, Vyas Depo, pgs. 77-78). More importantly, Mr. Graham was approached by a former co-worker who knew of the theft and that Mr. Graham had been accused. (Ex. A, Graham Depo, pg. 202).

## V. CONCLUSION

Mr. Graham was terminated not based on his alleged violation of a Best Buy policy, but as one of Best Buy's few African-American managers he chose to complain about Best Buy's discriminatory treatment of African-Americans, both customers and employees. His prosecution simply went a step further. He came naturally to mind as the perpetrator because he was an African-American male which was on Mr. Collins' mind

Although ignored by Best Buy, Mr. Graham has presented substantial evidence which demonstrates issues of fact as to the reason for his termination and as to Best Buy's motives in accusing him of theft. Best Buy is not entitled to judgment at this stage.

Respectfully submitted,


_____/s/ Kami D. Rowles_____
NANCY C. SCHUSTER #0020690
KAMI D. ROWLES #0071030
The Bevelin House
2913 Clinton Avenue
Cleveland, Ohio 44113
(216) 348-1100 (Telephone)
(216) 348-0013 (Facsimile)
ss@apk.net (e-mail)

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of July, 2007, a copy of the foregoing Plaintiff's Brief in Opposition to Defendant Best Buy's Motion for Summary Judgment has been served upon the following via the Court's Electronic Filing System:

Matthew D. Besser                                      *Counsel for Defendant Best Buy*
David  A. Campbell, III
Vorys, Sater, Seymour & Pease
2100 One Cleveland Center
1375 East Ninth Street
Cleveland OH 44114


_____*/s/ Kami D. Rowles*_____
NANCY C. SCHUSTER #0020690
KAMI D. ROWLES #0071030

*Counsel for Plaintiff*

20