IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

~~~~~~~~~~~~~~~~~~~~

MICHAEL GRAHAM,

      Plaintiff,

vs.           Case No. 1:06CV2091

BEST BUY STORES, L.P., et al.,

      Defendants.

~~~~~~~~~~~~~~~~~~~~

Deposition of
PETER GAUTHIER

April 4, 2007
10:46 a.m.
Taken at:
Lorain County Justice Center
225 Court Street, Third Floor
Elyria, Ohio


EXHIBIT G

Todd L. Persson, Notary Public

Page 2

1  APPEARANCES:
2
3      On behalf of the Plaintiff:
4          Schuster & Simmons Co., LPA, by
5          NANCY C. SCHUSTER
6          The Bevelin House
7          2913 Clinton Avenue
8          Cleveland, OH 44113
9          (216) 348-1100
10         ss@apk.net
11
12     On behalf of the Defendant:
13         Vorys, Sater, Seymour and Pease,
14         LLP, by
15         MATTHEW D. BESSER, ESQ.
16         DAVID CAMPBELL, ESQ.
17         2100 One Cleveland, Center
18         1375 East Ninth Street
19         Cleveland, OH 44114
20         (216) 479-6100
21         mdbesser@vssp.com
22
23
24
25

Page 3

1  APPEARANCES, Continued:
2
3      On Behalf of the Witness:
4          Office of Lorain County Prosecutor,
5          by
6          M. ROBERT FLANAGAN, ESQ.
7          Lorain County Justice Center
8          225 Court Street, Third Floor
9          Elyria, OH 44035
10         (440) 329-5454
11             ~ ~ ~ ~ ~

Page 4

1                    I N D E X
2
3   EXAMINATION OF           5    6
4   PETER GAUTHIER
5   BY MR. CAMPBELL
6   EXAMINATION OF           53   11
7   PETER GAUTHIER
8   BY MS. SCHUSTER
9
10  Exhibit 1 was marked     14   20
11  Exhibit 2 was marked     26   3
12  Exhibit 4 was marked     55   19
13  Exhibits 5 and 6         56   8
14  were marked
15  Exhibit 3 was marked     57   21
16  Exhibit 8 was marked     120  20

Page 5

1        PETER GAUTHIER, of lawful age,
2  called for examination, as provided by the
3  Federal Rules of Civil Procedure, being by me
4  first duly sworn, as hereinafter certified,
5  deposed and said as follows:
6        EXAMINATION OF PETER GAUTHIER
7  BY MR. CAMPBELL:
8        Q.  Could you please state your name
9  for the record?
10       A.  Peter. Gauthier. G-a-u-t-h-i-e-r.   10:46:39
11       Q.  And I'm sure you've taken many
12 depositions, and I don't know if you've been
13 through many, but --
14       A.  I've never taken a deposition in my
15 entire life.                                  10:46:56
16       Q.  Really. Okay. Well, I'll give you
17 a little bit of the ground rules. And I
18 introduced myself briefly before the
19 deposition. I'm David Campbell. This is my
20 colleague, Matt Besser. We're both with the   10:47:04
21 Vorys Sater law firm in Cleveland, Ohio. We
22 are representing Best Buy in a lawsuit filed by
23 Michael Graham. It arises out of his
24 employment, which has really no relation at all
25 to you or your office. But there is also an   10:47:19

2 (Pages 2 to 5)

Page 38

1  believe, the Macedonia Best Buy store. I'm not
2  positive of that. And that person also looked
3  at the video and said that looks like
4  Mr. Graham.
5      And he had -- the photos that are      11:19:04
6  indicated in the discovery that we talked about
7  a few minutes ago, those were photos that
8  Mr. Collins had gotten some photos from the
9  Macedonia store that contained pictures of
10 Mr. Graham. And I forget whether they were   11:19:17
11 from a Hawaiian party or a Halloween party, or
12 there was some party that the employees of that
13 particular Best Buy had. Mr. Graham was in
14 those photos. Mr. Collins got those photos and
15 showed them to someone who worked at the Elyria  11:19:32
16 Best Buy, which is the victim in this
17 particular theft, and that person indicated
18 that they recognized that person in that photo,
19 Mr. Graham, as being in the store on the day of
20 the theft.      11:19:46
21    Q. Okay.
22    A. In addition to the fact that
23 Mr. Graham had been fired recently from Best
24 Buy, I think three weeks previously. And in
25 addition to the fact that he was an assistant   11:19:56

Page 39

1  manager and would have had access to the keys.
2  And unfortunately, apparently there's only
3  three types of keys for all these registers,
4  which I just thought was crazy.
5      So all those things together,    11:20:09
6  Mr. Collins, the Macedonia employee, the
7  employee from Elyria Best Buy, the fact that he
8  had recently been fired, the fact that he was
9  an assistant manager and would have had access
10 to the keys; all of those things went into my    11:20:18
11 evaluation of the file.
12    Q. Okay. What was your conclusion as
13 to your evaluation of the file?
14    A. I thought he was guilty.
15    MS. SCHUSTER: Objection. I ask    11:20:29
16 that his so-called conclusion be stricken.
17    Q. And let me move forward. As to
18 Best Buy, there was an allegation from defense
19 counsel that Best Buy may have had improper
20 motives for bringing this criminal matter    11:20:48
21 against Mr. Graham.
22    A. Correct.
23    Q. Did you, through your evaluation,
24 did you reach any conclusions as to Best Buy's
25 motives?      11:20:55

Page 40

1      MS. SCHUSTER: Objection.
2    Q. Was there any support to her --
3  based on your independent review of the file,
4  was there any support to defense counsel's
5  claim?      11:21:04
6      MS. SCHUSTER: Objection.
7    A. I never saw a copy of the EEOC
8  complaint. I didn't know when it was filed. I
9  didn't know if it was filed. I knew what I had
10 in front of me.      11:21:14
11    Q. And what was in front of you showed
12 that they could reasonably believe it was
13 Mr. Graham?
14    MS. SCHUSTER: Objection.
15    A. Let me answer this question in that    11:21:19
16 way. As a prosecutor, I have to evaluate files
17 when I get them. If I -- my first duty, if you
18 look at any book about what a prosecutor's
19 duties are, my first duty is to do justice. In
20 15-plus years, okay, I have never, I personally    11:21:35
21 have never prosecuted somebody I felt was
22 innocent or that I could not sustain a
23 conviction beyond a reasonable doubt, okay? If
24 I go forward with a case, therefore I must
25 believe I can win that case. It applies to    11:21:52

Page 41

1  Mr. Graham, it applies to Joe Schmo down the
2  street, it applies to every case I have. If I
3  don't believe I can win that case, then I don't
4  proceed with it, period. If I believe I can
5  win it, then I proceed with it. That's just    11:22:06
6  for every case, period.
7    Q. And so you believed you could win
8  the Graham case?
9    A. Based on the information I had in
10 the file, yes.      11:22:14
11    Q. What ultimately happened in the
12 Graham case?
13    A. Ms. Murel provided me with those
14 two names. And one of them was Kirby,
15 K-i-r-b-y, Wadell, W-a-d-e-l-l. I believe the    11:22:27
16 second name was Thurman Knox, K-n-o-x.
17    Q. Okay.
18    A. For some reason Mr. Knox got
19 knocked out as a possible, whether he was in
20 prison or something. I'm not sure. And so --    11:22:40
21    Q. And just to verify, "knocked out"
22 meaning there was some clear alibi?
23    A. There was some reason why he could
24 not be the possible person responsible for the
25 Best Buy in Elyria theft.      11:22:52

Page 42

1  Q. Okay.
2  A. The focus became on Mr. Wadell.
3 Ms. Murel provided me with a name of Detective
4 Klein, K-l-e-i-n, from Parma Police Department,
5 who had a similar type theft in Parma. Whether    11:23:05
6 she got that information from that newspaper
7 article, I do not know. But she provided me
8 with Detective Klein's name. I started
9 contacting Detective Klein as to whether he had
10 any video from, or any information on his case.    11:23:22
11        I also did some investigation
12 myself, for instance, checking to see whether
13 Mr. Wadell was or was not incarcerated in some
14 facility during this period of time, I think it
15 was May 9th, I'm not positive, to see whether    11:23:39
16 he was incarcerated someplace, thereby knocking
17 him out as a possible suspect. So I undertook
18 that myself, and I found out, I believe, that
19 he was at least out and about during that
20 period of time.    11:23:53
21        And eventually I got ahold of
22 Detective Klein in Parma, who, you know, agreed
23 to -- he said he had the Parma video on his
24 computer, and asked if I could send our video
25 to him. I did. I had our investigator bring    11:24:06

Page 43

1 it to him. He did a video, a side-by-side, and
2 the person in the video, quite frankly, could
3 have been Mr. Wadell. It could not have been
4 also. But there's a possibility that it could
5 have been Mr. Graham, for all I know.    11:24:27
6        But at that point in time when
7 there is a reasonable possibility that it could
8 have been somebody else other than Mr. Graham,
9 again, it still could have been Mr. Graham, at
10 that point in time there was no way I was going    11:24:40
11 to prove my case in court beyond a reasonable
12 doubt. At that point in time I dismissed the
13 case.
14  Q. So it was merely on the sight, in
15 looking at these two videos that there could    11:24:52
16 be, two people looked like the people on these
17 videos, I guess?
18  A. Yeah.
19  Q. Could resemble the people on the
20 video?    11:25:03
21  A. Correct.
22  Q. And just so we're clear, that
23 video, the side-by-side, your office will make
24 a copy and deliver it to us?
25  A. That's correct.    11:25:12

Page 44

1        MR. CAMPBELL: Why don't we agree
2 that that will be Exhibit 3 when that is given
3 to us as a copy, the side-by-side from the
4 Parma --
5        MS. SCHUSTER: I need to clarify    11:25:20
6 something. Is the box that is called Maxell
7 that is sitting on the conference table the
8 side-by-side video?
9        THE WITNESS: Yes.
10        MR. CAMPBELL: And that's going to    11:25:30
11 be Exhibit 3, and they'll give a copy to us
12 post deposition, because that's the only one
13 they have.
14        MS. SCHUSTER: Is this the original
15 side-by-side video, the box on the table?    11:25:37
16        THE WITNESS: Yes.
17        MR. CAMPBELL: So can we agree that
18 the side-by-side video will be Exhibit 3, it
19 will be produced after the deposition?
20        MS. SCHUSTER: Correct.    11:25:52
21        MR. CAMPBELL: Okay. And we have
22 agreement of counsel on Exhibit 3.
23  Q. And there's some photos, some still
24 photos here on the table. Let me just verify.
25 First of all, let me show you this stack, and    11:26:05

Page 45

1 tell me what those are.
2  A. These five photos right here were
3 produced on November 22, 2005 when I and
4 Mr. Collins and the, what's that kid's name,
5 whatever that kid's -- I think his last name is    11:26:34
6 Luindowski.
7  Q. Okay.
8  A. The kid from the Geek Squad at Best
9 Buy. He produced these pictures that day. I
10 believe I gave copies to Ms. Murel that day    11:26:45
11 also. These pictures were produced that day,
12 these top five.
13  Q. Are those copies that we could put
14 in as an exhibit, or are these your only --
15  A. These are actually -- he made a    11:26:55
16 whole bunch of copies, and some of these are
17 probably actually the same photograph,
18 different tints, etc., different hues. And Ms.
19 Murel was provided those. These are the ones I
20 got from Best Buy that day.    11:27:08
21  Q. So we can't put those in as an
22 exhibit?
23  A. We can have copies made for you.
24        MR. CAMPBELL: Why don't we put all
25 the photos, we'll talk about them all, but    11:27:19

12 (Pages 42 to 45)

Peter Gauthier

Page 50

1 talking. We were talking about the holidays,
2 vacations, etc. Mr. Collins looked at me and
3 said I kind of hope this shows it's not him.
4 He was referring to the video. Quite frankly,
5 that surprised me. Nobody's ever told me they        11:35:23
6 wished the person charged with the crime wasn't
7 guilty before. He told me he wished it wasn't
8 him, and he said in any event, I hope we get an
9 answer one way or the other.
10      And that was in specific reference        11:35:36
11 to -- the Geek Squad person was trying to use
12 some sort of program, whether it was Photoshop
13 or something along those lines, to enhance the
14 photos from the VHS.
15      Q. To verify --                11:35:48
16      A. To verify, or either to verify or
17 to unverify, I guess.
18      Q. And let me just ask you, one, were
19 they able to enhance to verify?
20      A. Not greatly. I mean, again, they        11:35:57
21 changed, as you can see on the Exhibit 4,
22 Deposition Exhibit 4, the photos are different
23 hues, and he tried to do different hues and
24 tints and stuff to try and make it a clearer
25 picture. It's an old -- it was an old system        11:36:10

Page 51

1 that -- Multi-Plex was an old system, and it
2 just wasn't very good.
3      Q. And just to verify, the picture
4 from the Multi-Plex, either the stills or the
5 actual moving pictures, it resembled        11:36:25
6 Mr. Graham, but nobody could be for certain it
7 was him or someone else?
8      A. Correct.
9      Q. Okay. So what else did
10 Mr. Collins, do you recall him telling you at        11:36:39
11 any time?
12      A. In reference -- I asked him about
13 the EEOC complaint. Mr. Collins indicated to
14 me that he did not know anything about that
15 EEOC complaint until after the investigation in        11:36:50
16 this particular case.
17      Q. Okay.
18      A. And when ultimately I got the stuff
19 back from Parma, he came to my office. I showed
20 him the photos, and he looked at me and said        11:37:06
21 what do you need from me? I said what do you
22 mean? He goes do you need a letter dismissing
23 the case? I said no, I'll take care of that.
24 But there was no hesitation. He agreed to
25 dismissal of the case immediately. So he        11:37:19

Page 52

1 didn't fight it. He didn't -- you know. Those
2 are things that I remember about my
3 conversations with Mr. Collins.
4      Q. Just a final question, just so I
5 understand. Was anybody ever prosecuted for        11:37:31
6 the Elyria theft at Best Buy?
7      A. No.
8      Q. Okay. And why not?
9      A. To this day, I have no idea whether
10 it was Mr. Wadell or Mr. Graham or some other        11:37:41
11 individual.
12      Q. Okay.
13      A. You know, at some point in time I
14 thought about sending an investigator out to
15 talk to Mr. Wadell, but he got out of prison        11:37:52
16 shortly after I came up with that idea, and it
17 never happened.
18      Q. So based on your review of the file
19 and the interviews, review of the photos and
20 whatnot, the photograph from Best Buy resembles        11:38:05
21 both Mr. Graham and Mr. Wadell, but you just
22 can't be for certain?
23      MS. SCHUSTER: Objection.
24      Q. You can answer.
25      A. Yeah. I have no idea whether it's        11:38:17

Page 53

1 Mr. Wadell or Mr. Graham, or even a third or a
2 fourth different person. I don't know. And if
3 I don't know, then I'm not going to win my case
4 at trial beyond a reasonable doubt, so I
5 dismissed the case.                11:38:29
6      Q. Thank you very much for taking the
7 time. I'm sure that there might be some
8 questions from plaintiff's counsel in our civil
9 case, but thank you for taking the time.
10      A. Sure.                11:38:39
11      EXAMINATION OF PETER GAUTHIER
12 BY MS. SCHUSTER:
13      Q. Mr. Gauthier, we've met here and we
14 met briefly on the telephone when I called to
15 ask you if you were available for deposition by        11:38:47
16 the parties and/or available for interview by
17 the parties.
18      A. Correct.
19      Q. And at that time you told me that
20 it was not your policy to speak with either        11:39:06
21 party, you were not going to speak with either
22 party, and if anybody wanted to speak with you,
23 they needed to see the prosecutor.
24      A. I don't think I said I was not
25 going to talk. I said you have to talk to my        11:39:18

14 (Pages 50 to 53)

Page 78

1    Q.   When does the office undertake its
2    own investigations?
3    A.   That's up to Mr. Will, I guess.
4    That's probably those high profile cases that I
5    talked about earlier. I don't know, honestly.    12:08:27
6    Q.   So it would not be something that
7    would be done in the typical case. You would
8    not look at a case and say, gee, it would be
9    nice if Mr. So-and-so were interviewed and have
10   the Prosecutor's investigator do it?    12:08:42
11   A.   No. Typically in a case when I use
12   a supervisor it's to serve a subpoena, or to
13   help me find a witness who I am unable to find.
14   Q.   You mean an investigator?
15   A.   I'm sorry, yes. Use an    12:08:52
16   investigator to either serve a subpoena
17   personally on somebody to ensure their
18   appearance, or to find a witness who I'm unable
19   to find myself.
20   Q.   So what you would do, however, if    12:09:03
21   you felt that somebody needed to be talked to
22   is call the involved police department and ask
23   them to do it?
24   A.   Correct.
25   Q.   In this particular case did you    12:09:13

Page 79

1    call the Elyria PD and ask them to do any
2    additional investigation?
3    A.   I don't recall that I did.
4    Q.   And that is something that you
5    probably would have noted in your personal    12:09:28
6    notes and would recall if you had done it?
7    A.   Probably.
8    Q.   Do you know who took this case into
9    the Grand Jury?
10       MR. FLANAGAN: Objection. I    12:09:42
11   instruct the witness not to answer based on
12   Grand Jury secrecy proceedings, attorney/client
13   privilege and work product.
14   Q.   Do you know who is the prosecutor
15   assigned to the Grand Jury -- who was the    12:09:53
16   prosecutor assigned to the Grand Jury at the
17   time of the indictment of Michael Graham?
18   A.   Yes, I do know who that was.
19   Q.   And who was that?
20   A.   His name is David Muhek, M-u-h-e-k.    12:10:03
21   Q.   Is he still assigned to the Grand
22   Jury?
23   A.   Yes.
24   Q.   Are you familiar with the Grand
25   Jury procedure here in Elyria as it may differ    12:10:21

Page 80

1    from the procedure in Cuyahoga County?
2    A.   A little, I suppose.
3    Q.   Do you know whether or not cases
4    are taken in one at a time or in groups?
5    A.   I'm not positive. My best belief    12:10:37
6    is that they're taken in one at a time.
7    Q.   Generally, it would be the case
8    that the police officers would testify to the
9    Grand Jury rather than any private witnesses?
10   A.   Generally, yes.    12:10:53
11   Q.   Do you know when the decision is
12   made to have private witnesses testify?
13   A.   That's up to the Grand Jury
14   Prosecutor. It depends on the case.
15   Q.   And the Grand Jury Prosecutor can    12:11:04
16   make that decision on his own, can he not?
17   A.   I believe so.
18   Q.   Do you know whether typically in a
19   non high profile case evidence is actually
20   presented to the Grand Jury, other than the    12:11:26
21   testimony of the police officer?
22   A.   Evidence in terms of photographs
23   and documents?
24   Q.   Documents, right.
25   A.   That I don't know. That I don't    12:11:34

Page 81

1    know.
2    Q.   Did you personally meet with
3    Detective Roth or Patrolman Currier about this
4    case?
5    A.   The only time I really met with    12:11:57
6    Detective Roth was to get the videotape,
7    wherever that is right now, the original
8    videotape so that I could present it to, first
9    to Best Buy for them to get, you know, the
10   Multi-Plex view off of it, to get it onto CD,    12:12:11
11   and then to have it sent to Parma, I believe.
12   And I may have contacted him other times, but
13   it was for purely administerial things like
14   that.
15   Q.   At any time did you discuss with    12:12:26
16   Detective Roth whether or not he had seen the
17   video?
18   A.   I don't recall.
19   Q.   Do you know whether or not he was
20   able to play the video?    12:12:36
21   A.   I have no idea. You know what, he
22   may have. Because I know when they gave the
23   tape to us, it was -- they only sent over a
24   copy of the relevant portion of time. So it's
25   a guess on my part, but I believe he was able    12:12:56

21 (Pages 78 to 81)

Page 102

1  Q. Specifically, right.
2  A. I don't recall him saying whether
3  it was the hairline or the thin face, or I
4  don't recall him saying one thing or the other.
5  Q. Okay. If you had a question about      12:43:27
6  the case, would you have called the Elyria PD
7  or would you have called Mr. Collins?
8  A. Probably Mr. Collins.
9  Q. Do you know if the Elyria PD did
10 any investigation in addition to whatever      12:43:57
11 investigation Mr. Collins did?
12 A. I don't believe so. I think their
13 role in this was purely administerial, you
14 know, the collection of the evidence and
15 keeping of the evidence and stuff like that.      12:44:09
16 Presentation to Grand Jury if, in fact, they
17 are the ones who did it.
18 Q. So you were collecting the evidence
19 from Mr. Collins, recording what they collected
20 and seeing that it got to the Grand Jury?      12:44:21
21 A. That would be their position, that
22 will be their job, yeah, in this particular
23 case. Whether they tried to contact
24 Mr. Graham, I don't know. It might be
25 reflected in the report. I just don't      12:44:31

Page 103

1  remember.
2  Q. So to the extent that information
3  was presented to the Grand Jury, it would have
4  been the information which Mr. Collins
5  gathered?      12:44:44
6  MR. FLANAGAN: Objection. I
7  instruct you not to answer the question.
8  Q. Do you know of any information
9  other than what Mr. Collins gathered that was
10 presented to the Grand Jury?      12:44:53
11 MR. FLANAGAN: Objection. I
12 instruct the witness not to answer.
13 Q. I take it that the Elyria PD would
14 have relied on Mr. Collins' investigation in
15 this particular matter?      12:45:15
16 A. For the most part, yes. They may
17 have -- again, whether they followed up by
18 calling Mr. Graham and having him come in or
19 trying to talk to him, I don't recall. But
20 since the video was already there, and since      12:45:28
21 the photos had already been confiscated by
22 Mr. Collins, and since his job is actually Loss
23 Prevention Officer, I believe he did the
24 majority of the work in this particular case.
25 Q. Were you aware of other thefts at      12:45:47

Page 104

1  Best Buys during that period?
2  A. At that particular Best Buy?
3  Q. No. Or at other -- were you aware
4  that they were having a series of thefts during
5  the time --      12:46:04
6  MR. CAMPBELL: I'm going to object
7  as to the characterization of the evidence.
8  A. I remember Mr. Collins telling me
9  that Christmas time is his busy season,
10 especially in the beginning of the year,      12:46:15
11 January. And that most of the people that he
12 has to fire are let go in the early part of the
13 year, because he has to review all of the stuff
14 from the holiday season, and most of the thefts
15 come to light. So that his busiest part of his      12:46:27
16 job comes in like January, February. That's
17 when he has to fire the most people for thefts
18 occurring over the holiday season. But it
19 didn't sound any different than any other year.
20 It sounds like that was a yearly thing.      12:46:42
21 Q. And it sounds like he was talking
22 about thefts by employees?
23 A. Yes. And -- well, actually, he
24 never delineated only employees. But in terms
25 of theft by employees, the greatest period of      12:46:52

Page 105

1  time that occurring is during the holiday
2  season.
3  Q. Do you recall when you had that
4  conversation with him?
5  A. It may have been around the      12:47:03
6  November 22nd. Whether it was specifically
7  that day or sometime after that, I'm pretty
8  sure it was on November 22nd.
9  Q. And the conversation regarding the
10 keys, when did you have that conversation with      12:47:14
11 him?
12 A. That may have been a phone
13 conversation prior to meeting with him. And I
14 may have even gotten that information from
15 Detective Roth about there being only like      12:47:26
16 three keys for like every register in the
17 entire country, which I thought was just crazy.
18 Q. Did you mention your surprise to
19 Mr. Collins?
20 A. I think I probably did, yeah.      12:47:36
21 Q. Do you recall what he said?
22 A. I think he was similarly perturbed
23 by that.
24 Q. So to your understanding, he was
25 saying that one of three keys could open every      12:47:51

27 (Pages 102 to 105)

Page 106

```
1   cash register, every Best Buy cash register
2   anywhere?
3        A.   I believe if you had three keys,
4   and I'm not sure on the number, maybe it's
5   three, maybe it's four. I'm not positive of        12:48:07
6   the number. If you had all three of them, you
7   could probably open not only any register at
8   Best Buy, but at most of the stores in the
9   entire country.
10       Q.   Did he say that those were cash           12:48:16
11  register keys, or were those keys to like open
12  the store and also cash register keys?
13       A.   I don't recall. My impression was
14  cash register keys.
15       Q.   I think I asked you this question,       12:48:47
16  or somebody did, but --
17            MR. FLANAGAN: Objection. Asked
18  and answered.
19       Q.   -- I'm going to do it again. Did
20  you send a subpoena to Best Buy, or was it only    12:48:58
21  the defense?
22       A.   For what? When?
23       Q.   For anything. In other words, I
24  think you testified that there was in your file
25  some documents which were copies of documents      12:49:13
```

Page 107

```
1   which the defense had subpoenaed.
2        A.   I know that Ms. Murel had sent a
3   subpoena to Best Buy. And I think she may have
4   also sent a copy to me. Mr. Collins gathered
5   the information that she requested, and I          12:49:27
6   believe he sent it to her, and she also sent me
7   a copy. And whether I -- the case was
8   scheduled for trial on one or two occasions
9   prior to its dismissal. I might have sent
10  trial subpoenas to witnesses. I don't recall       12:49:42
11  whether I did or not.
12           MS. SCHUSTER: Let me look through
13  this file one time.
14       A.   I don't see any subpoenas in the
15  material that's included in Deposition Exhibit    12:50:50
16  1. So I may not have sent any subpoenas out.
17       Q.   That would indicate to you that you
18  probably did not, am I correct?
19       A.   Probably did not.
20       Q.   Because in the ordinary course, if      12:51:03
21  you did send a subpoena, that copy should be in
22  the file?
23       A.   Correct.
24       Q.   And that would not be something
25  that you would take out of the file?               12:51:11
```

Page 108

```
1        A.   I don't -- I didn't make the
2   determination of what to take, leave in or take
3   out of the file. I know I prepared a form to
4   request subpoenas, but I don't believe
5   subpoenas were ever issued.                        12:51:25
6        Q.   Anything that is not in this file,
7   Exhibit 1, would have been -- let me start
8   over.
9             Anything that was, in fact,
10  contained in your file but is not contained in    12:51:42
11  Exhibit 1 would have been removed by you or by
12  your counsel or by someone else?
13       A.   By my counsel, Mr. Flanagan.
14       Q.   And did he show you what he
15  removed?                                           12:51:59
16       A.   I think so.
17       Q.   Did you --
18       A.   Quickly.
19       Q.   Did you review the removed
20  documents prior to testifying? When you           12:52:08
21  reviewed the file, were the removed documents
22  in it?
23       A.   I believe some of them were, at
24  least.
25       Q.   Do you recall which ones?                12:52:21
```

Page 109

```
1        A.   I believe I looked at my notes ever
2   so quickly. Quite frankly, the only thing I
3   looked for in my notes was that date, the date
4   that we went to Best Buy. That's the only
5   thing I looked for. There were other notes        12:52:35
6   that I did not review.
7        Q.   If you saw those notes, they would
8   refresh your recollection, would they not?
9        A.   As to what?
10       Q.   As to whatever's in them.               12:52:43
11       A.   Well, I suppose.
12       Q.   In other words, if you had, if you
13  noted that you had a conversation with somebody
14  on a concern day and you had forgotten, if you
15  saw your notes, it would refresh your             12:52:54
16  recollection if that occurred?
17       A.   If I, in fact, chose to memorialize
18  that conversation, yes.
19            MS. SCHUSTER: I'm going to ask you
20  to produce the notes.                              12:53:03
21            MR. FLANAGAN: The notes will not
22  be produced.
23            MR. CAMPBELL: You haven't even
24  issued a subpoena, so it's not even something
25  that you guys are --                               12:53:15
```

28 (Pages 106 to 109)

Peter Gauthier

Page 126

1          CERTIFICATE
2  The State of Ohio, )
3          SS:
4  County of Cuyahoga. )
5
6      I, Todd L. Persson, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, PETER GAUTHIER,
10 was by me first duly sworn to testify the
11 truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotypy in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19      I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

Page 127

1      I do further certify that I am not
2 a relative, counsel or attorney for either
3 party, or otherwise interested in the event of
4 this action.
5      IN WITNESS WHEREOF, I have hereunto
6 set my hand and affixed my seal of office at
7 Cleveland, Ohio, on this __19th__ day of
8 _____July_____, 2007.
9
10
11
12
13 ___Todd L. Persson___
14 Todd L. Persson, Notary Public
15 within and for the State of Ohio
16
17 My commission expires July 28, 2007.
18
19
20
21
22
23
24
25

Page 128

1     SIGNATURE OF WITNESS
2
3
4
5
6      The Deposition of PETER GAUTHIER, taken
7 in the matter, on the date, and at the time and
8 place set out on the title page hereof.
9      It was requested that the deposition be
10 taken by the reporter and that same be reduced
11 to typewritten form.
12      It was agreed by and between counsel and
13 the parties that the reading and signing of the
14 transcript of said deposition, be and the same
15 is hereby waived.
16
17
18
19
20
21
22
23
24
25