LEXSEE 2005 US DIST LEXIS 27259

**JOYCE HELMS, Plaintiff, v. FISCHER MANAGEMENT INC., et al., Defendants.**

Case No. C-1-04-480

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

*2005 U.S. Dist. LEXIS 27259*

**November 10, 2005, Decided
November 10, 2005, Filed**

**DISPOSITION:** [*1]

**COUNSEL:** For Joyce Helms, Plaintiff: David Gerard Torchia, Tobias & Kraus - 1, Cincinnati, OH.

For Fischer Management Inc, Les Hiatt, Defendants: David Thomson Croall, Rachel E Burke, Porter, Wright, Morris & Arthur - 1, Cincinnati, OH; Lori A Clary, Porter Wright Morris & Arthur LLP, Columbus, OH.

**JUDGES:** Herman J. Weber, Senior Judge, United States District Judge.

**OPINION BY:** Herman J. Weber

**OPINION**

**ORDER**

This matter is before the Court upon defendant's motion for summary judgment (doc. 12), plaintiff's opposing memorandum (doc. 17), and defendant's reply (doc. 21). Defendant has filed proposed findings of fact and conclusions of law, which plaintiff has highlighted as true, false, or irrelevant (doc. 20).

**I. Introduction**

Plaintiff originally filed this action in the Hamilton County, Ohio Court of Common Pleas. She brought claims against defendants Fischer Management, Inc. (Fischer) and Les Hiatt, an employee of Fischer at all relevant times. Plaintiff makes the following allegations in the complaint: Fischer does business in Hamilton, County, Ohio. Defendant Hiatt is a resident of Hamilton County, Ohio. [*2] Plaintiff worked as a sales person. In late summer of 2001, a dispute over commissions arose between plaintiff and Hiatt. Hiatt wanted credit for three sales that plaintiff was instrumental in making. On or about October 15 or 22, 2001, the issue was raised in a weekly staff meeting. In the presence of other sales counselors and plaintiff's immediate supervisor, Greg Beckett, Hiatt yelled at plaintiff and falsely called her a "thief" and a "cheat." Beckett did nothing to stop Hiatt. Plaintiff left the room, but she was ordered to return to the meeting, where Hiatt continued his attack. Following the meeting, plaintiff was so embarrassed and humiliated that she could not function properly and work effectively. Her co-workers rarely spoke to her and ostracized her. She sold no more homes. Beckett later ordered plaintiff to either pay Hiatt one-half of the commissions she had earned or to face more serious consequences. Plaintiff did as she was told. Hiatt was later observed waving a check at a party and stating, "That bitch will never mess with me again." By January of 2001, plaintiff could no longer tolerate the situation and was constructively discharged. Based on these allegations, [*3] plaintiff brings a claim for defamation against Hiatt (Count I) and a claim for gender discrimination against Fischer under *Ohio Rev. Code § 4112.02(A)* (Count II).

Defendants removed the action to this court pursuant to *28 U.S.C. § 1446(b)* on the ground that the amount in controversy exceeds $ 75,000 and both of the defendants "are in a different state than Plaintiff." Specifically, defendant alleges that plaintiff is a citizen of the State of Ohio, Fischer is corporation under the laws of Kentucky

and has its principal place of business in the Commonwealth of Kentucky, and Hiatt is a citizen of the Commonwealth of Kentucky.

Plaintiff has not contested defendants' jurisdictional allegations or the removal.

**II. Undisputed facts**

The following facts are undisputed unless otherwise noted.

1. Defendant Fischer is a builder of single-family homes and townhomes.

2. Defendant Hiatt is employed by Fischer in its Attached Division as a sales counselor selling townhomes on a commission basis.

3. Plaintiff began her employment with Fischer in January 1998.

4. Plaintiff was employed in the same division and in [*4] the same capacity as Hiatt, until she voluntarily quit her employment in late January 2002 following a dispute several months earlier with Hiatt over commissions. During 2001, plaintiff was a sales counselor at a community called "Marivale" and Hiatt was at a different location.

5. As a sales counselor, plaintiff's job was to promote and sell townhomes in the community to which she was assigned, although she was permitted to sell homes in other communities as well.

6. Plaintiff's work site was the model home in her assigned community, and contact with her co-workers was generally limited to weekly sales meetings at Fischer's corporate offices and occasional telephone conversations.

7. In December 1999, Greg Beckett became the Attached Division Sales Manager and supervisor to all of the sales counselors in the Attached Division, including plaintiff and Hiatt.

8. Plaintiff testified at her deposition that before Beckett was promoted to the Sales Manager position, he acted as her informal mentor.

9. Beckett rated plaintiff as "Fully Satisfactory" overall in her 2000 and 2001 performance evaluations. In the 2000 evaluation, Beckett gave plaintiff the same or higher [*5] ratings in all of the specific categories than she gave herself in her self-appraisal. Plaintiff was satisfied with the evaluations.

10. While plaintiff was employed by Fischer, it had in place a computer system for its sales counselors to use for registering customers.

11. Following an initial contact with a potential customer, the sales counselor could enter information about the customer into Fischer's computer system so that the customer would be "protected" by the sales counselor for thirty days.

12. If a Fischer home were sold to that customer during the thirty-day period, the sales counselor who registered the customer would receive all or part of the commission for the sale.

13. The thirty-day "protected" period could be extended if the sales counselor made efforts to follow up with the potential customer during that time.

14. Not all of the sales counselors used the computer system, and plaintiff herself did not. Nonetheless, the sales counselors' practice was to share commissions when appropriate.

15. In mid-2001, Hiatt learned at a weekly sales meeting at which plaintiff was in attendance that plaintiff had sold a townhome to a customer whom [*6] he had previously registered and/or had the initial contact with.

16. Hiatt told plaintiff, "That's my customer." Plaintiff told Hiatt that they would talk about it later. There was no further discussion about the matter at that sales meeting.

17. Hiatt subsequently learned that plaintiff had sold a townhome to a second customer whom he had previously registered and/or had the initial contact with.

18. In October 2001, Beckett conducted a weekly sales meeting with plaintiff, Hiatt, and the four other Attached Division sales counselors (Jason Sayers, Pat Mangan, Kelly Stringer, and Lois Siereveld).

19. During the meeting, the subjects of cross-selling, or of one sales counselor making a sale in a community in which a different counselor is assigned, and of protecting customer leads were raised.

20. In the context of this discussion, Hiatt learned that plaintiff had sold a townhome to a third customer whom he had previously registered and/or had the initial contact with.

21. Because he believed that plaintiff had been paid or had claimed commissions for these sales of which he was entitled to at least a portion, Hiatt became upset. Plaintiff claims that [*7] Hiatt called her a "thief" and a "liar" and said that plaintiff had "cheated him out of money."

22. Hiatt made the initial contact with all three of these customers, but plaintiff claimed that Hiatt had not "followed through" with them.

23. Plaintiff began to cry. Hiatt left the room and then returned to the meeting. Plaintiff claims that when Hiatt returned to the meeting, he repeated his prior statements.

24. Plaintiff claims that Beckett said nothing during the course of her exchange with Hiatt, except to ask her to not leave the meeting. Plaintiff left the meeting anyway. Beckett sent another sales counselor to find plaintiff and to ask her to return to the meeting. Plaintiff complied, and the rest of the meeting was routine.

25. Following the sales meeting, Beckett asked that both plaintiff and Hiatt stay and meet with him privately. Beckett told the two of them that he wanted them to work out the issue between themselves.

26. Plaintiff returned to her model home later that day to perform her regular job duties, and Beckett called her to inquire as to whether or not she was okay.

27. Within a day or two of the October 2001 sales meeting, sales counselor [*8] Sayers called Helms to talk to her about Hiatt and his allegations. Plaintiff had a number of conversations with Sayers in the months following the meeting.

28. Sayers testified at his deposition that he held plaintiff in high regard both before he heard her side of the story and got all of the details and after he had talked to her and obtained the details on what had happened.

29. Plaintiff also had some contact with Mangan. She, Mangan, and Sayers went out to lunch together when Mangan decided to quit his employment with Fischer to stay home and be a "house husband." Plaintiff testified at her deposition that the lunch was pleasant and that Mangan was cordial and "somewhat" friendly.

30. Mangan's opinion of plaintiff was unchanged by his observation of the dispute that had occurred at the sales meeting.

31. Other than at the weekly sales meetings which plaintiff continued to attend, plaintiff had no contact after the October 2001 sales meeting with Hiatt, Stringer, or Siereveld.

32. Although Hiatt, Stringer, and Siereveld did not reach out to contact her, plaintiff did not choose to talk to them either.

33. Despite Beckett's urging that she attend a [*9] holiday party sponsored by a mortgage company used by Fischer at which plaintiff's co-workers would be present, plaintiff chose to not attend the party.

34. Plaintiff also chose to not attend Mangan's going-away party, which was attended by the other Attached Division sales counselors.

35. Approximately a week after the October 2001 sales meeting, Beckett went to plaintiff's model home to meet with her. Beckett told plaintiff that because she and Hiatt had not come to an agreement regarding how to resolve their commission dispute, he would resolve it for them.

36. Beckett determined that the three commissions should be split evenly between plaintiff and Hiatt. Beckett told plaintiff that if she did not accept his decision and split the commissions with Hiatt, her employment could be terminated.

37. Although plaintiff disagreed with Beckett's decision, she wrote a check to Hiatt for $ 775.80 (one-half of the after-taxes commission for one of the three sales for which she had already been paid) and gave it to Beckett. Plaintiff told Beckett that she did not want him to take the money that he had determined she owed Hiatt out of the commission checks that she would [*10] receive from Fischer.

38. Following the closing of the sale to the second customer, Beckett went to plaintiff's model home to ask her for the second check in the amount of $ 694.29.

39. Plaintiff believes she gave Beckett a check in that

amount, but she cannot specifically recall doing so and she does not have a record of the check.

40. At Mangan's going-away party, Hiatt spoke to Sayers about his commission dispute with plaintiff. Sayers later told plaintiff that Hiatt pulled a check that plaintiff had written out of his wallet, showed it to Sayers, and said something to the effect of "this is what happens when you fuck with me." Sayers alleges that Hiatt made the comment directly to him, no one else heard it, and Hiatt then put the check back into his wallet and the wallet into his pocket. Sayers told no one other than plaintiff about this alleged incident.

41. Sayers testified at his deposition that this incident did not make him think any less of plaintiff but it did make him think less of Hiatt.

42. In late January 2002, plaintiff resigned her employment because she "just couldn't deal with the situation."

43. When she went into Fischer's corporate [*11] officers to drop off her keys and her beeper, plaintiff spoke to Wayne Menchhofer, Beckett's supervisor. Menchhofer offered to transfer plaintiff out of the Attached Division and into the Single Family Division of the company. Plaintiff turned down the offer.

44. Plaintiff never paid Hiatt the portion of the commission for the third disputed sale as instructed by Beckett, and it was not deducted from her final paycheck. Instead, Fischer paid the amount directly to Hiatt, in effect paying that portion of the commission twice in order to fulfill the commitment that Fischer had made to Hiatt.

### III. Summary judgment standard

*Fed. R. Civ. P. 56* allows summary judgment to secure a just and efficient determination of an action. This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific [*12] facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id. at 249* (citing *Cities Serv.,* 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84, 87 S. Ct. 1425, 18 L. Ed. 2d 577 (1967), or is not significantly probative, *Cities Serv.,* 391 U.S. at 290, judgment may be granted. *Anderson,* 477 U.S. at 249.

### IV. Gender [*13] discrimination claim

#### A. The parties' positions

Defendants argue that plaintiff cannot prevail on her gender discrimination claim as a matter of law because she cannot prove that she suffered an adverse employment action and, more particularly, a constructive discharge; plaintiff cannot prove that males were treated more favorably than she was treated, and she instead bases her claim on speculation on how she would have been treated had she engaged in the same conduct as Hiatt and her unsubstantiated belief that Beckett favored males over females; and there is no evidence of pretext. Defendants allege that the record is entirely devoid of evidence that plaintiff's gender played any role whatsoever in Beckett's handling of the incident that allegedly resulted in plaintiff's discharge.

Plaintiff alleges that defendant Fischer is not entitled to summary judgment on her gender discrimination claim because reasonable jurors could find that "plaintiff's decision to resign was objectively reasonable under the circumstances." Plaintiff summarizes the situation confronting her as follows:

> She was falsely and publicly accused of being a thief. She was humiliated in front [*14] of her peers. She was ostracized.

She was ordered to pay Hiatt, who failed to follow-up with the customers and who accused her of being a thief, half of the commission she earned. She was threatened with termination if she did not. When Plaintiff learned that Hiatt displayed her first payment to a co-worker and made a crude comment that she would not "f-- with him anymore" Beckett, who already knew about the comment, simply said he'd hoped Plaintiff would not find out about it. Plaintiff received no support from Beckett. He did nothing except tell her to "get over it." Hiatt was never disciplined. There was no message to anyone that unprofessional and mean-spirited behavior like Hiatt's would not be tolerated. It was clear Beckett would allow Hiatt to do whatever he wanted. Plaintiff feared that each time a customer visited her community, the potential for another dispute existed. She did not register customers. She was afraid to do her job. She did not make any sales as a result. She could not work and succeed under those conditions. Reasonable jurors could easily agree that this was an intolerable situation.

Plaintiff alleges that the length of time she remained on the job following [*15] the commissions dispute does not, as a matter of law, preclude her from presenting a claim for constructive discharge. Plaintiff further alleges that the offer of a transfer by Menchhofer was "too little too late" and just one factor that the jury should be permitted to consider in determining whether plaintiff's decision was reasonable. Plaintiff asserts that Beckett showed favoritism toward Hiatt by ordering her to give one-half of the commissions to Hiatt when he had done nothing more than register the customers. Plaintiff asserts that Beckett made statements about women that tend to show that he held them in disfavor and that such evidence is relevant to her discrimination claim. Specifically, after a female named Terri Simmons had resigned from Fischer, Beckett allegedly stated that he would not hire any more women and he proceeded to hire five men, including Sayers. Also, Beckett purportedly made a disparaging remark to employee Carol Perkins about the fact that a woman had drafted a memo that Perkins did not understand and, after Perkins confronted him about his remark, Beckett responded with another negative remark, indicating that his wife preferred working with men rather [*16] than women. Plaintiff alleges that these comments are relevant to Beckett's state of mind and clearly show why Beckett treated Hiatt so well and plaintiff so poorly.

Plaintiff also alleges that there is evidence of pretext, specifically, evidence that gender played a role in Beckett's handling of the commissions dispute that purportedly led to her constructive discharge. Plaintiff alleges that she did the work and made the sale; she was falsely accused of stealing; she was verbally attacked at a sales meeting and then told by Hiatt that she was acting "just like a woman" when she gave in to the humiliation and started to cry; she was told not to leave the meeting when Hiatt was free to come and go; Beckett ordered plaintiff to give half of the money she earned to Hiatt, who has provided no evidence that he did anything to further the sales process; and Hiatt has never been disciplined for his "abhorrent behavior." Plaintiff alleges that,

> Hiatt was clearly treated better than Plaintiff. Beckett made negative comments about women. He did nothing when Hiatt made a gender-based remark about Plaintiff crying. Beckett ordered Plaintiff to give up half of her commissions, knowing [*17] full well that Plaintiff had previously warned him about the potential problem with the Gardner situation [one of the customers with whom Hiatt had made the initial contact]. In light of the foregoing, jurors could find that gender motivated Beckett's decisions regarding Plaintiff and Hiatt.

### B. Applicable law

Ohio law prohibits gender discrimination in employment decisions. Under the law of this Circuit, the same evidentiary framework applicable to discrimination claims brought under Title VII applies to discrimination claims brought under state law. *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992). A plaintiff claiming discrimination under these statutes may establish a prima facie case by introducing either direct or circumstantial evidence that the defendant discharged the

plaintiff because of her membership in a protected class. ***McDonnell Douglas Corp v. Green,*** *411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973)*; ***Manzer v. Diamond Shamrock Chemicals Co.,*** *29 F.3d 1078, 1081 (6th Cir. 1994)*. Plaintiff may establish a prima facie case of discrimination through circumstantial evidence by showing **[*18]** that: 1) she was a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position lost or not gained; and 4) she was replaced by someone outside of the protected class. ***Manzer,*** *29 F.3d at 1081* (citing ***McDonnell Douglas,*** *411 U.S. at 802*; ***Gagne v. Northwestern Nat. Ins. Co.,*** *881 F.2d 309, 313 (6th Cir. 1989))*.

Plaintiff may also establish the fourth prong of a prima facie case by showing that she was treated less favorably than a similarly-situated employee outside of her protected class. ***Clayton v. Meijer, Inc.,*** *281 F.3d 605, 610 (6th Cir. 2002)*. In such a case, plaintiff must prove that all relevant aspects of her employment situation were similar to those of the employee with whom she seeks to compare herself. ***Ercegovich v. Goodyear Tire & Rubber Co.,*** *154 F.3d 344, 352 (6th Cir. 1998)*. To be similarly-situated in a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating **[*19]** or mitigating circumstances which would distinguish their conduct or the employer's treatment of them for that conduct. ***Id. at 352*** (citing ***Mitchell,*** *964 F.2d at 583*).

A constructive discharge qualifies as an adverse employment action. ***Hann v. Perkins Twp.,*** *2004 Ohio 3445, 2004 WL 1465743, *4 (Ohio App. 6 Dist.)* (citing ***Hoon v. Superior Tool Co.*** (Jan. 24, 2002), 8th Dist. No. 79821; ***Policastro v. Northwest Airlines, Inc.,*** *297 F.3d 535, 539 (6th Cir. 2002))*. A constructive discharge occurs where "the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." ***Mauzy v. Kelly Services, Inc.,*** *75 Ohio St.3d 578, 1996 Ohio 265, 664 N.E.2d 1272*, syll. P4, *75 Ohio St. 3d 578, 1996 Ohio 265, 664 N.E.2d 1272 (1996)*. A claim of constructive discharge is in essence a claim that the employer's conduct was so egregious that the employee was "forced . . . to sever the employment relationship involuntarily." ***Risch v. Friendly's Ice Cream Corp.,*** *136 Ohio App.3d 109, 112, 736 N.E.2d 30, 32 (1999)*.

In determining whether a constructive discharge **[*20]** has occurred, the fact-finder must look at the totality of the circumstances. ***Hogan v. Field Container Corp.,*** *145 Ohio App.3d 446, 453, 2001 Ohio 2204, 763 N.E.2d 612, 617 (2001)*. An employee's belief that she was compelled to resign must be judged "without consideration of [her] undue sensitivities." ***Risch,*** *136 Ohio App.3d at 113, 736 N.E.2d at 32*. The length of time that an individual remains on the job does not, as a matter of law, preclude a claim for constructive discharge. ***Sutherland v. Nationwide Gen. Ins. Co.,*** *96 Ohio App.3d 793, 809, 645 N.E.2d 1338, 1349 (1994)*.

The elements of a prima facie case of discrimination are not intended to be inflexible. ***Furnco Constr. Corp. v. Waters,*** *438 U.S. 567, 575, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)*. As the facts necessarily will vary in employment discrimination cases, different proof to establish a prima facie case will be required depending on the factual situation. ***Id.*** *at 576*. What is true of all employment discrimination cases, however, is that the "plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions **[*21]** remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" ***Id.*** (citing ***Int'l Bhd. of Teamsters v. United States,*** *431 U.S. 324, 358, 97 S. Ct. 1843, 1866, 52 L. Ed. 2d 396 (1977))*. The plaintiff's burden at the prima facie stage of the proceedings is not onerous, but "merely serves to raise a rebuttable presumption of discrimination by 'eliminating the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'" ***Cline v. Catholic Diocese of Toledo,*** *206 F.3d 651, 660 (6th Cir. 2000)* (citing ***Hollins v. Atlantic Co.,*** *188 F.3d 652, 659 (6th Cir. 1999)* (quoting ***Texas Dep't of Community Affairs v. Burdine,*** *450 U.S. 248, 253-54, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981))*.

The employer is entitled to summary judgment if the plaintiff does not establish a prima facie case. ***Mitchell,*** *964 F.2d at 582-84*. If the plaintiff establishes a prima facie case, the employer can overcome the prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. ***McDonnell Douglas,*** *411 U.S. at 802, 93 S.Ct. at 1824.* **[*22]** If the employer carries its burden, the plaintiff must show that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. ***Burdine,*** *450 U.S. at 253, 101 S.Ct. at 1093*. Plaintiff has the

ultimate burden of proving that her membership in the protected class was a determining factor in the adverse employment decision. *Chappell v. GTE Products Corp., 803 F.2d 261, 265 (6th Cir. 1986).*

**C. Fischer is entitled to summary judgment on the gender discrimination claim**

Plaintiff asserts that "reasonable jurors could find that [her] decision to resign was objectively reasonable under the circumstances," however, this is not the standard to be applied. The standard is whether the conditions under which plaintiff was required to work were so intolerable that a reasonable individual working under those conditions would feel compelled to resign. Plaintiff has failed to allege specific facts that create a genuine issue as to whether the applicable standard is satisfied. Rather, for the reasons stated below, a reasonable fact-finder could not conclude that plaintiff was constructively discharged by [*23] Fischer as opposed to voluntarily resigning.

First and foremost, the primary incident giving rise to plaintiff's alleged constructive discharge is not attributable to defendant Fischer. Rather, it was the outburst and accusations by Hiatt, a co-worker, that largely precipitated plaintiff's decision to resign. While Beckett could have acted more assertively to rein Hiatt in, he did not create the situation or expressly condone Hiatt's behavior.

Second, plaintiff does not allege that Hiatt behaved inappropriately toward her or that he disparaged her in front of her co-workers after the initial incident, with the exception of the one incident where Hiatt waved plaintiff's check and made an insulting comment about the commissions split to Sayers. This was an isolated incident, however, and there is no evidence that any sales counselor other than Sayers was aware of the incident. Plaintiff does not allege that any of her other co-workers behaved inappropriately toward her, mistreated her, or were hostile toward her because of the commissions dispute or otherwise. Although plaintiff professes to being uncomfortable around her co-workers following the incident with Hiatt, and while there [*24] may have been a cooling of her relationship with her co-workers, the evidence does not permit the conclusion that Fischer, by its own acts and omissions, created a work environment that could be considered intolerable for an individual of ordinary sensibilities.

Third, plaintiff does not allege any acts or omissions by Beckett or any other member of Fischer's management following Hiatt's outburst that may have contributed to an intolerable work situation. Although plaintiff faults Beckett's subsequent resolution of the commissions dispute, his decision to have plaintiff and Hiatt split the commissions after they could not come to an agreement between themselves is a routine business decision for which there was a rational basis, given that there was no dispute that it was Hiatt who had the initial contact with the customers. Accordingly, the decision cannot be deemed intolerable and a contributing factor to the constructive discharge.

Fourth, there is no evidence that before defendant learned plaintiff was quitting, which occurred after she had cleaned out her office, plaintiff had conveyed to Beckett or to another member of Fischer's management that she perceived her work situation [*25] to be intolerable. Plaintiff therefore gave Fischer no opportunity to attempt to rectify the situation. Defendant did present plaintiff with an opportunity to resolve the situation when it learned she was quitting by offering her a position in another division. Plaintiff, however, has offered no valid reason for declining Fischer's offer out-of-hand.

Given the totality of the circumstances then, a reasonable jury could not find that the isolated incident with Hiatt, embarrassing though it undoubtedly was for plaintiff, together with Beckett's handling of the incident would have compelled a reasonable individual to resign her employment several months later. This is particularly true since there were no further incidents of serious import during the ensuing months, plaintiff had only limited contact with Hiatt and her other co-workers, and Fischer made plaintiff a reasonable offer of an alternative position. Thus, plaintiff has failed to come forward with sufficient evidence to establish a constructive discharge.

Assuming for summary judgment purposes that plaintiff has produced evidence to establish an adverse employment action either in the form of a constructive discharge or based [*26] on the decision to have plaintiff and Hiatt split the sales commissions [1], the Court nonetheless finds that plaintiff's gender discrimination claim must fail because she has not come forward with sufficient evidence to satisfy the fourth prong of a prima facie case. Plaintiff claims that Beckett showed favoritism toward Hiatt by ordering her to give one-half

of the commissions on the disputed sales to Hiatt when he had done nothing more than register the customers on those sales. To support her claim that Beckett treated Hiatt more favorably than plaintiff in resolving their dispute because Hiatt is a male, plaintiff points to derogatory statements that Beckett allegedly made about women (see *supra,* see pp. 10-11). This evidence is insufficient to satisfy plaintiff's burden. First, plaintiff's evidence does not show that she was treated differently than a similarly-situated male in any material respect. Beckett treated plaintiff and Hiatt identically in resolving the commissions dispute in that he required them to split the commissions evenly when the two could not reach a resolution on their own. Second, plaintiff has not shown that the few isolated, disparaging statements about [*27] women that Beckett allegedly made to other individuals were in any way related to his resolution of the commissions dispute. Absent any evidence linking the statements to Beckett's handling of the dispute, a reasonable fact-finder could not infer that Beckett acted pursuant to an anti-female animus in deciding to split the commissions between Hiatt and plaintiff after they had failed to resolve the dispute on their own. For these reasons, the Court finds that defendant Fischer is entitled to summary judgment on plaintiff's claim for gender discrimination.

> 1 The Court notes that plaintiff paid no more than $ 2,000 to Hiatt while her salary for 2001 was somewhere between $ 120,000 and $ 130,000. See plaintiff's depo., p. 153.

**V. Defamation claim**

**A. The parties' positions**

Defendants allege that plaintiff cannot prevail on her defamation claim as a matter of law because she cannot establish the elements of that claim. Defendants contend that Hiatt's alleged statements were statements of opinion, [*28] given the context of the statements and the exaggerated and emotional nature of the statements; the statements were protected by a qualified privilege under Ohio law since they were made in good faith and all those present when the statements were made had a common interest in the subject matter of the statements; plaintiff cannot prove that Hiatt acted with actual malice; and plaintiff cannot prove that she was damaged by Hiatt's statements.

In response, plaintiff contends that the Court should reject defendants' attempt to convert Hiatt's statements of fact to opinions and that there are issues of fact underlying her defamation claim. Plaintiff argues that defendant Hiatt is not entitled to summary judgment on her defamation claim based on his position that his statements were expressions of opinion rather than assertions of fact. Plaintiff contends that the "opinion" defense applies to constitutionally protected speech when statements are made in the public marketplace, whereas what occurred in this case is not a matter of public concern. Plaintiff also avers that although cases from the Ohio Supreme Court addressing defamation in the employment context are plentiful, defendants [*29] have failed to cite any such case where a court has accepted the defense that the employer was merely stating an opinion. Plaintiff cites the following cases to illustrate this point: ***Worrell v. Multipress,*** *45 Ohio St.3d 241, 543 N.E.2d 1277 (1989)* (stock prospectus explaining absence of president from a corporation because of his failure to adequately perform his duties); ***Fawcett v. G.C. Murphy,*** *46 Ohio St.2d 245, 348 N.E.2d 144 (1976)* (allegation by management of theft of box of cookies by plaintiff from store where she worked); ***Hahn v. Kotten,*** *43 Ohio St.2d 237, 331 N.E.2d 713 (1975)* (allegations communicated to insureds to whom plaintiff had sold policies or for whom he had serviced the policies to the effect that the plaintiff had diverted his company's or insureds' funds to his own use; he had withheld premium payments from the company and kept them in his personal business account; he had lied to the company about the whereabouts of the additional company funds; and he was in arrears in remitting more than $ 5,000 in group premiums to the company); ***Blatnik v. Avery Dennison Corp.,*** *148 Ohio App. 3d 494, 2002 Ohio 1682, 774 N.E.2d 282 (2002)* [*30] (false allegation of sexual harassment made by employer against employee in meeting with co-workers).

Plaintiff contends that even if the opinion defense is applicable, courts have held that statements calling an individual's honesty into question, such as the statements made by Hiatt, do not constitute opinions but rather verifiable and actionable statements of fact. In support of this proposition, plaintiff cites ***Milkovich v. Lorain Journal Co.,*** *497 U.S. 1, 21, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)* (connotation that petitioner had committed perjury in a judicial proceeding sufficiently factual to be susceptible of being proven true or false) and ***Disciplinary Counsel v. Gardner,*** *99 Ohio St.3d 416, 420-21, 2003 Ohio 4048, 793 N.E.2d 425 (2003)*

(sanctions imposed in disciplinary proceedings against an attorney who made allegations of judicial impropriety against a panel of the Court of Appeals that were not protected by the United States or Ohio Constitution). Plaintiff further alleges that since Hiatt's accusation of theft was defamatory per se, damages are conclusively presumed as a matter of law.

Hiatt claims that plaintiff's effort to draw a distinction between public **[*31]** figures and private figures with respect to protecting opinions is unavailing. Defendant contends that there is no support for the proposition that the opinion defense does not apply in the employment context. Defendant argues that the cases cited by plaintiff to support her claim that the allegations made by Hiatt were factual allegations as opposed to opinions are inappropriate in that each of those cases involved statements accusing an individual of specific wrongdoing that could be proved or disproved. Finally, defendant asserts that plaintiff cannot show damages in the form of lost income because she cannot establish a constructive discharge.

**B. Applicable law**

The elements of a defamation claim are (1) an unprivileged publication, (2) false and defamatory language about another, and (3) requisite malice. ***Tohline v. Central Trust Co.,*** *48 Ohio App.3d 280, 284, 549 N.E.2d 1223 (1988)* (citing ***McCarthy v. Cincinnati Enquirer, Inc.,*** *101 Ohio App. 297, 136 N.E.2d 393 (1956))*. Statements of opinion cannot be defamatory because they cannot be proven to be true or false. ***Wampler v. Higgins,*** *2000 WL 730218 *14* **[*32]** (Ohio App. 4 Dist., 2000), *aff'd, 93 Ohio St.3d 111, 2001 Ohio 1293, 752 N.E.2d 962 (2001)*. The protection afforded expressions of opinion applies to both media and non-media parties. ***Wampler,*** *93 Ohio St.3d 111, 2001 Ohio 1293, 752 N.E.2d 962*. The protection applies to the benefit of a defamation defendant only when the alleged defamatory statements constitute statements of opinion as a matter of law. *Id. at 119, 752 N.E.2d at 970*.

The determination of whether allegedly defamatory language is opinion or fact is a question of law to be decided by the court. ***Vail v. The Plain Dealer Publishing Co.,*** *72 Ohio St.3d 279, 280, 1995 Ohio 187, 649 N.E.2d 182, 184 (1995)* (citing ***Scott v. News-Herald,*** *25 Ohio St.3d 243, 250, 25 Ohio B. 302, 496 N.E.2d 699, 705 (1986))*. The Court employs a totality of the circumstances test to determine whether a statement is fact or opinion. ***Vail,*** *72 Ohio St.3d at 282, 649 N.E.2d at 185*. Factors to be considered in making the determination include the specific language used; whether the statement is verifiable; the general context of the statement; and the broader context in which it **[*33]** was made. *Id.* (citing ***Scott,*** *25 Ohio St.3d at 250, 496 N.E.2d at 706*). The court seeks to determine under the second factor whether the statements in issue "are objectively capable of proof or disproof." ***Wampler,*** *93 Ohio St.3d at 129, 752 N.E.2d at 979*.

A publication is privileged when it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." ***Hahn v. Kotten,*** *43 Ohio St.2d 237, 244, 331 N.E.2d 713, 718 (1975)*. The elements of a qualified privilege are good faith, an interest to be upheld, a statement limited in its scope to that purpose, a proper occasion, and publication in a proper manner and to proper parties only. ***Hahn,*** *43 Ohio St.2d at 244, 331 N.E.2d at 719*. Statements made in good faith about a matter of common interest between two employees regarding a third employee are subject to a qualified privilege. ***Vitale v. Modern Tool & Die Co.,*** *2000 WL 804617 *4 (Ohio App. 8 Dist., 2000)* (citing ***Hanly v. Riverside Methodist Hosp.,*** *78 Ohio App. 3d 73, 603 N.E.2d 1126 (1991)*; **[*34]** ***Gray v. Allison Div., Gen Motors Corp.,*** *52 Ohio App.2d 348, 351, 370 N.E.2d 747 (1977))*. The statement must be limited in scope to the common purpose and must be made to proper parties only. *Id.* (citing ***Hanley,*** *78 Ohio App.3d 73, 603 N.E.2d 1126*). Once a qualified privilege is shown to exist, the plaintiff can prevail only upon a showing of actual malice. *Id.* Whether a qualified privilege exists is a question of law for the court, unless there are factual disputes as to the circumstances of the occasion for the publication. ***A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,*** *73 Ohio St. 3d 1, 7-8, 1995 Ohio 66, 651 N.E.2d 1283, 1290 (1995)* (citations omitted).

To prove actual malice, the plaintiff must show that the defendant acted either with knowledge that the statements were false or with reckless disregard as to their truth or falsity. ***Kremer v. Cox,*** *114 Ohio App.3d 41, 63, 682 N.E.2d 1006, 1020 (1996)*. To show reckless disregard for the truth, plaintiff must show by clear and convincing evidence that (1) false statements were made with a high degree of **[*35]** awareness of their probable falsity, or (2) the defendant entertained serious doubts as

to the truth of the publication. *Perez v. Scripps Howard Broadcasting Co.,* 35 Ohio St.3d 215, 218, 520 N.E.2d 198, 202 (1988).

The existence of an injury is an essential element of a defamation claim. *Nat'l. Medic Servs. Corp. v. E.W. Scripps Co.,* 61 Ohio App.3d 752, 755, 573 N.E.2d 1148, 1150 (1989). A private figure alleging defamation can recover damages for shame, humiliation, and mental anguish that she suffered as a result of the defamatory statement. *Lansdowne v. Beacon Journal Publishing Co.,* 32 Ohio St.3d 176, 181, 512 N.E.2d 979, 984 (1987).

A false statement that impugns an individual's character or injures one in his trade, profession, or occupation is defamatory per se. *Tohline,* 48 Ohio App.3d at 284, 549 N.E.2d 1223 (citing *Becker v. Toulmin,* 165 Ohio St. 549, 138 N.E.2d 391 (1957)). If the defamatory words are actionable per se, malice is presumed. *Id.* (citing *Becker,* 165 Ohio St. at 553, 138 N.E.2d at 395).

**C. Hiatt is entitled [*36] to summary judgment on the defamation claim**

Initially, the Court rejects as unfounded plaintiff's position that the "opinion" defense applies only when statements are made in the public marketplace. The Court finds no basis in the case law for restricting the protection afforded expressions of opinion in this manner. Rather, because a defamatory statement is by definition false, and because a statement of opinion cannot be proven as true or false, it stands to reason that an expression of one's opinion cannot be defamatory. Accordingly, if the statements made by Hiatt were expressions of opinion as opposed to statements of fact, then his statements are not actionable under the law of defamation.

Upon consideration of the totality of the circumstances surrounding Hiatt's statements, the Court finds as a matter of law that the statements were expressions of opinion that are not actionable under Ohio defamation law. It is true that Hiatt phrased his beliefs about plaintiff at least in part in criminal terms and that the commission of a crime is capable of being proved or disproved. It is likewise clear from the context in which the statements were made, however, that Hiatt was not [*37] accusing plaintiff of having violated a criminal law. Rather, Hiatt was accusing plaintiff of having "stolen" customers with whom Hiatt had made the initial contact and of acting contrary to company policy and to Hiatt's belief that he was entitled to a commission on the sales by retaining the full commissions on sales to those customers. Hiatt made these statements in the context of a sales meeting where the issue of splitting commissions had come up, so that it was clear to all present what Hiatt meant by his statements. It is likewise clear that whether plaintiff was entitled to the full commissions on the sales in issue was a matter of dispute between the parties. Plaintiff has offered an explanation for why she believes she was not required to share the commissions with Hiatt, but her explanations do not conclusively establish that she was entirely in the right and that Hiatt was not entitled to any portion of the commissions based on his initial contacts with the customers. Rather, the record shows that there was no clear-cut policy for splitting commissions and that the sales counselors, including plaintiff, did not always follow the procedures for registering customers that [*38] were in place. Thus, whether or not plaintiff was wrong in failing to split with Hiatt commissions for certain sales that she made is not a clear-cut matter that can be objectively proved or disproved.

There are further considerations that lead to the Court to conclude that Hiatt's statements are not actionable as assertions of fact under Ohio defamation law. The Court believes it is clear that if Hiatt had claimed in a respectful and civil way at the staff meeting that he was entitled to a portion of the commissions that plaintiff had collected on sales to customers with whom he had made the initial contact, then plaintiff would not have an actionable claim for defamation. The fact that Hiatt was not respectful and instead spoke angrily and framed his accusation in derogatory and/or criminal terms does not change this result and somehow transform what would otherwise be a lawful expression of his belief that he was entitled to a portion of the commissions into a defamatory statement. In making this determination, the Court finds relevant the fact that the statements were made in a work setting, among fellow employees, at a sales meeting where the subject of splitting commissions [*39] had been raised. An ordinary listener under these circumstances would conclude that Hiatt was expressing his subjective belief that he was entitled to a portion of the commissions on sales where he had made the initial contacts with the customers and that plaintiff was wrong to retain the full commissions, which is a belief that Hiatt was entitled to hold and to express without exposing himself to civil liability. From the totality of the circumstances, the Court finds as a matter of law that

Hiatt's statements were expressions of his opinion which cannot support a cause of action for defamation.

## VI. Conclusion

In accordance with the foregoing, defendant's motion for summary judgment (doc. 12) is **GRANTED.** This case is **DISMISSED** and is **TERMINATED** on the docket of the Court at plaintiff's cost.

**IT IS SO ORDERED.**

11/10/2005

Herman J. Weber, Senior Judge

United States District Court