LEXSEE 2007 US APP LEXIS 12344

**DONALD H. MACDERMID, Individually and as Administrator of the Estate of NINA KAY MACDERMID, Plaintiff-Appellant, v. DISCOVER FINANCIAL SERVICES d/b/a DISCOVER CHARGE CARD, Defendant-Appellee.**

No. 06-5792

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

07a0198p.06; *2007 U.S. App. LEXIS 12344*; *2007 FED App. 0198P (6th Cir.)*

**April 20, 2007, Argued
May 29, 2007, Decided
May 29, 2007, Filed**

**PRIOR HISTORY:** [*1] Appeal from the United States District Court for the Middle District of Tennessee at Columbia. No. 03-00111--E. Clifton Knowles, Magistrate Judge.
*MacDermid v. Discover Fin. Servs., 2006 U.S. Dist. LEXIS 30413 (M.D. Tenn., May 12, 2006)*

**COUNSEL:** ARGUED: William Kennerly Burger, BURGER, SISKIN, SCOTT & McFARLIN, Murfreesboro, Tennessee, for Appellant.

Scott D. Carey, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Nashville, Tennessee, for Appellee.

ON BRIEF: William Kennerly Burger, BURGER, SISKIN, SCOTT & McFARLIN, Murfreesboro, Tennessee, for Appellant.

Scott D. Carey, Mary Ann Miranda, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Nashville, Tennessee, for Appellee.

**JUDGES:** Before: MERRITT and MARTIN, Circuit Judges; FORESTER, District Judge. *

> * The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

**OPINION BY:** BOYCE F. MARTIN, JR.

**OPINION**

[**1] BOYCE F. MARTIN, JR., Circuit Judge. Donald MacDermid appeals from the magistrate judge's dismissal of his claims on the pleadings and at summary judgment. *See MacDermid v. Discover Fin. Servs., No. 1:03-0111, 2006 U.S. Dist. LEXIS 30413, 2006 WL 1454743 (M.D. Tenn. May 12, 2006)*. Mr. MacDermid alleges that his wife, who suffered from a severe form of bipolar disorder, [*2] committed [**2] suicide as a consequence of Discover Financial's harassing of the couple over $ 15,000 worth of purchases that she had made, but not paid for, on a Discover credit card. For the reasons discussed below, we **AFFIRM in part** and **REVERSE in part.**

I

The facts of this case were aptly set forth by the magistrate judge in his summary judgment order:

> In August 2002, Nina Kay MacDermid, using the "family computer" located upstairs in the home which she shared with her husband, Donald H. MacDermid, went on-line to the Discover Card web site and filled out an application requesting a credit card. She provided her personal information as well as personal information of her husband, like his Social Security number. She submitted the application for her husband as the primary card holder and herself as an authorized

buyer.

Subsequently, Mrs. MacDermid went on-line again in August and then in September and applied for two more Discover cards in her husband's name, providing Discover with his personal information and requesting that the cards be issued with him as the primary card holder and her as an authorized buyer. In order to be able to receive these credit [*3] cards from Discover without her husband's knowledge, she obtained a post office box in Linville, Tennessee. These cards were subsequently issued to her and she was able to intercept them and use them without her husband's knowledge.

Mrs. MacDermid made numerous purchases using her Discover cards. These purchases ranged from every day necessities such as gas and computer products to exotic cats.

Unbeknownst to Discover, Mrs. MacDermid had a long history of mental illness. She had been diagnosed in the early 1990s as having bipolar disease and being manic depressive. She underwent drug and alcohol counseling at Parthenon Pavilion (a Nashville psychiatric hospital) in the early 1990s. According to her husband, she continued to struggle with drug and alcohol problems into their marriage.

Mrs. MacDermid also had a history of manic spending sprees. She had previously run up credit card debt requiring her to file personal bankruptcy in the late 1990s. After her discharge from bankruptcy, her husband, who had helped her by paying off some of her debts, forbade her from having any credit cards.

After her bankruptcy, Mrs. MacDermid was on a "cash only basis." She was not working, and her [*4] husband would provide her with money for purchases which he felt were warranted. Hence, she surreptitiously obtained not only these three Discover cards, but also cards from American Express, Household Bank, and Chase, among others. According to Mr. MacDermid, his wife obtained all of these credit cards essentially the same way that she did the Discover cards (i.e., without his knowledge, and in his name, using his personal information).

On February 14, 2003, Mr. MacDermid intercepted checks which had been sent to his residence by Discover. Mr. MacDermid confronted his wife about these checks and she denied having any knowledge of them. He admits that he was angry. In his notes concerning the incident, Mr. MacDermid states that he had a "stressful confrontation" with his wife. He explained in his deposition that, "It was, you know . . . to my knowledge, I confronted her with it and that would be stressful to her, very stressful, under the circumstances."

Two days later, Mr. MacDermid found his wife in bed "in a near death condition." Mrs. MacDermid was admitted to Maury Regional Hospital on February 16, 2003, where she remained for five days until her discharge on February 21, 2003. [*5] [**3] The medical records list her discharge diagnosis as "acute narcotic overdose" and "anoxic brain injury." The records also indicate that she had "battled bipolar disease for about a decade."

Shortly after his wife was admitted to the hospital, Mr. MacDermid "went through [his wife's] stuff" when he "got back home from the hospital." He found a number of credit cards and statements showing that she was delinquent on a number of different credit cards. After Mr. MacDermid found these credit cards he "cancelled them." He "called each one and cancelled them and wrote letters to each one."

On March 1, 2003, Mr. MacDermid

wrote a letter to Discover Financial Services. . . . This letter states in pertinent part as follows:

> This is to confirm that the credit cards noted above, or any other credit instrument in my name to you, is not and has never been authorized nor requested by me. I was unaware of the cards, or you listing me as cardholder. I have not used them. I have not benefitted from it in any way, to the best of my knowledge.

In this letter, Mr. MacDermid also states that "I have never signed any request, authorization to open, or authorization for anyone **[*6]** else to obtain or use your cards." Mr. MacDermid does not dispute the fact that his wife obtained these Discover cards and purchased goods with them. He also admits that she was ultimately responsible for paying them.

After Mrs. MacDermid was released from the hospital, she was under the care and supervision of psychiatrist Dr. John Koomen. On Wednesday, June 11, 2003, two days before she committed suicide, she visited with Dr. Koomen. Sometime around that visit, she purchased a handgun. On June 13, 2003, Mrs. MacDermid used this newly-purchased handgun to commit suicide.

Mrs. MacDermid hand wrote a note for her husband, which Mr. MacDermid found after she had killed herself. This note, which is undated, states as follows:

> Dear Don,
>
> The pressure just got the best of me. I got to where I could not even function any more. I am so sorry I let the house go, and everything, please forgive me. I really do love you, but I just cannot take this kind of pressure, and humiliation any longer. I am so sorry for all the worry I have caused you Don, I just wish we were back at the old church once again. I really do love you. I am so sorry to do this to us, but I am not me any more Don. **[*7]** I do not want to take your money either. We should have spent more time together, some vacations, and not all work. I stayed here by myself way too much. I feel like I am having a nervous breakdown. I keep the shakes all the time, and numbness all through my body and paranoid, that is no way to live. I will always love you, your wife Kay.

Mr. MacDermid testified that he was shocked and surprised by his wife's suicide. He testified that she did not act any differently in the weeks leading up to her suicide. Mr. MacDermid did notice that his wife was "perhaps a little more relaxed." She did not have any conversation with him that, in hindsight, he thinks was out of character, or that indicated she was contemplating suicide or trying to say goodbye. Mr. MacDermid plainly admitted that "I didn't see it coming. I'll put it that way, in my own perspective." Mr. MacDermid did not think that her friends or family foresaw that she was going to commit suicide. He testified that certainly if his wife's **[**4]** mother thought that she would commit suicide, then her mother would have done something about it.

Mr. MacDermid was not specifically warned by Dr. Koomen, his wife's treating psychiatrist, **[*8]** that suicide was an imminent threat. Dr. Koomen did not tell Mr. MacDermid to take any specific precautionary measures to prevent his wife from taking her own life. Mr. MacDermid had a number of guns, including handguns, in the house, all of which were fully accessible to his wife. Dr. Koomen did not suggest to Mr. MacDermid that he should not have guns in the house.

In addition, Mrs. MacDermid had full access to all of her medication and was administering all of her medication herself, even though she had been hospitalized in February for an "acute narcotic overdose." Mr. MacDermid stated that he "wasn't really looking for a suicide." Mr. MacDermid further explained, "Nobody saw it coming to the extent that they would, you know, overtly do something about it, which would be saying, you know, Hey, you're in danger. I didn't see it. Nobody else did."

The last contact that Mr. MacDermid had with anyone from Discover was "probably a phone call . . . at least a week or two weeks prior to [the] suicide." Although he was not positive, Mr. MacDermid thought that the last contact that either he or his wife had with Discover was some time in May 2003.

Plaintiff has submitted the Affidavit **[*9]** of Dr. Koomen, which states in pertinent part as follows:

> As my attached hand-written notes indicate, Ms. MacDermid was primarily concerned by the recent allegation by a credit card creditor that she had been guilty of "credit card fraud." That reference appears on pages one (1) and two (2) of the "Initial Psychiatric Assessment" conducted by me at the commencement of my evaluation and treatment of Ms. MacDermid [which is dated 3/6/03]. During my initial interviews with Ms. MacDermid and in the ensuing weeks through April and May of 2003, Ms. MacDermid voiced apprehension over the allegations against her by the credit card company which was accusing her of credit card fraud. She was terrified at the prospect of going to jail and causing further embarrassment to her family, particularly her husband. While I did not discuss the specifics of the threats of jail with Ms. MacDermid, I note that she was preoccupied with the allegations of credit card fraud, and that it appeared to be the primary stressor which contributed to the deterioration of her emotional and mental condition in April and May of 2003. Subsequent to her selfinflicted gunshot death on June 13, 2003, it was reported **[*10]** to me by Mr. Don MacDermid, her husband, that she had just been threatened with immediate jailing by credit representatives of Discover Card, and that her fear and embarrassment related to the threat of incarceration appeared to be paramount in the voiced fears which led to her suicide.
>
> [. . .]
>
> Based upon my review

of the psychiatric records of Nina Kay MacDermid, my personal involvement in her psychiatric care from March of 2003 through the date of her death in June 2003, and upon the history of the threat of immediate jailing by collection agents for Discover Card, it is my opinion that it is more probable than not, within reasonable medical certainty, that the significant precipitating factor in the causation of the death of Nina Kay MacDermid were the **[\*\*5]** threats of criminal fraud prosecution and incarceration by the collection representatives. In the absence of the threats of arrest and incarceration, I believe that it is more probable than not, within reasonable medical certainty, that Ms. MacDermid could have maintained her rational thought processes, and the condition could have been stabilized, as it had many times in the past, through continued counseling and **[\*11]** appropriate medication. My office provided appropriate care, supervision, and treatment to Nina Kay MacDermid throughout our relationship with Ms. MacDermid. All care provided by my office, and under my supervision, was consistent with the local standard of care in the Columbia, Maury County, Tennessee medical community.

*MacDermid, 2006 U.S. Dist. LEXIS 30413, 2006 WL 1454743, at \*2-\*5.*

On October 9, 2003, Mr. MacDermid filed the instant action in federal court, alleging: (1) wrongful death, i.e., negligence on the part of Discover in causing Ms. MacDermid's suicide; (2) intentional infliction of emotional distress, based on Discover's actions in attempting to collect the debt purportedly owed it; (3) violation of the Tennessee Consumer Protection Act, *Tenn. Code Ann. § 47-18-101 et seq.*; (4) fraud; (5) civil extortion; (6) violation of the federal Fair Debt Collection Practices Act, *15 U.S.C. § 1692 et seq.*; (7) credit defamation/libel; and (8) violation of the federal Truth in Lending Act, *15 U.S.C. § 1601 et seq.* The parties consented to have all proceedings conducted by a magistrate judge.

**[\*12]** The above claims were largely dismissed by the magistrate judge upon Discover's motion to dismiss on the pleadings, but two claims were allowed to proceed to discovery: wrongful death and credit defamation. The magistrate judge subsequently granted Discover's motion for summary judgment on these two remaining claims, thus disposing of the case. Mr. MacDermid now appeals as follows: first, the 12(b)(6) dismissal in favor of Discover as to (a) intentional infliction of emotional distress, (b) violation of the Tennessee Consumer Protection Act, (c) violation of the federal Fair Debt Collection Practices Act, and (d) violation of the federal Truth in Lending Act; and second, the summary judgment ruling in favor of Discover on his wrongful death claim.

II

This Court reviews *de novo* both the 12(b)(6) and summary judgment rulings of the magistrate judge. *Adika v. Smith, 466 F.3d 503, 505 (6th Cir. 2006)*; *Bennett v. City of Eastpointe, 410 F.3d 810, 817 (6th Cir. 2005).*

In reviewing a 12(b)(6) motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts **[\*13]** in support of his claim which would entitle him to relief." *Kottmyer v. Maas, 436 F.3d 684, 688 (6th Cir.2006)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).* This Court "must accept all facts in the complaint as true and

construe the complaint liberally in favor of the plaintiff." *Adika, 466 F.3d at 505*.

In reviewing a summary judgment motion, "the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party." *Bennett, 410 F.3d at 817* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1996))*. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting *Fed. R. Civ. P. 56(c))*. [**6]

### A. Claims Dismissed on the Pleadings

#### *(i) Intentional Infliction of Emotional Distress*

[*14] Tennessee state courts recognize the tort of intentional infliction of emotional distress, although they typically refer to this tort as "outrageous conduct." *See Bain v. Wells, 936 S.W.2d 618, 622 n.3 (Tenn. 1997)* ("Intentional infliction of emotional distress and outrageous conduct are not two separate torts, but are simply different names for the same cause of action."). Regardless of chosen moniker, however, the elements of the tort are clear: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Id.*; *see also Medlin v. Allied Inv. Co., 217 Tenn. 469, 398 S.W.2d 270, 274 (Tenn. 1966)*. Both parties agree that the second element--i.e., whether or not Discover's conduct was "so outrageous"--is primarily at issue in the instant case.

Mr. MacDermid argues that Discover's conduct, as depicted in his complaint, was at least sufficient to state a claim for outrageous conduct under Tennessee law. In particular, MacDermid asserts that because Discover was on notice of his wife's "fragile [*15] mental status," the company crossed the line between "excessive (but permissible) pressure tactics" and "outrageous conduct which is intended to cause harm that is disproportionate to the creditor's right to seek payment." Discover counters by noting that Tennessee courts "have been very reluctant to find that a creditor's objectionable collection methods constitute outrageous conduct." This is especially true, argues Discover, in situations where, as here, the creditor is *actually owed* the debt in question, and where the debtor/decedent has *actually committed* credit card fraud by "unlawfully submitting" her husband's personal information over the internet to obtain the credit cards. The magistrate judge sided with Discover.

We cannot agree with this dismissal of the outrageous conduct claim at the 12(b)(6) stage. While Discover is correct that it was actually owed the debt in question, we disagree with its contention that Mrs. MacDermid was necessarily criminally liable for credit card fraud. As such, Mr. MacDermid has at least stated a claim for outrageous conduct based on Discover's threats of criminal prosecution for failure to pay a purely civil debt. Mr. MacDermid's [*16] amended complaint states as follows:

> The conduct, threats and statements described herein as having been made by the Defendant were persistent and increasing in frequency throughout the spring of 2003 and were made to both Plaintiff and decedent. As a direct and proximate result of the Defendant's conduct, threats and statements as described herein, the decedent required psychiatric hospitalization only a few weeks before her untimely death on June 13, 2003. The Plaintiff will show that during telephone conversations with the Defendant's collection agents throughout the Spring of 2003, and culminating in the time around the decedent's death, the Plaintiff repeatedly warned the Defendant's agents of the very severely debilitated mental and physical condition of the decedent and that the condition was caused by those collection efforts, specifically the implicit and, at times, explicit threat that decedent would be jailed if the subject debt was not quickly paid. During several of the above-referenced telephone calls, but at least several weeks or months prior to the decedent's death, the Plaintiff warned Defendant's agents that their continued collection efforts, including threats [*17] of criminal prosecution, would lead to the decedent's death or would otherwise "kill"

her because of the decedent's debilitated mental and physical condition.

[**7] MacDermid also related in his complaint a telephone conversation that he had on April 9, 2003 with Adonica Gilmore, a Discover employee. Because MacDermid had taped the conversation, he was able to describe it in some detail in his complaint:

. that she [Adonica Gilmore] had checked with the local District Attorney's office and had spoken with a lady named "Harriott" who had told her that, under the facts described above, Mr. MacDermid is legally liable for his wife's charge card; and

. that she had filed a report with the Giles County Sheriff's office; and

. that Harriott Barkly of the Giles County District Attorney's office, advised her that because the MacDermids were married, and because Mr. MacDermid was aware of his wife's problem, he "should keep a better eye on her" and should "keep her away from the internet"; and

. [that Adonica Gilmore stated about Mrs. MacDermid,] *"I don't think you want her going . . . well you know"*; and

. that there was no need for him [*18] to talk to a lawyer, because, even though there was no signature, and it was procured on the Internet, Mrs. MacDermid's application is binding on Mr. MacDermid, and he is definitely liable; and

. that [Adonica Gilmore stated], if the matter could not be resolved, *"I'll just call Harriott" . . . and have the authorities "take a little trip out to your house."*

(Emphasis added.)

The Tennessee Supreme Court has stated that with respect to creditor-debtor interactions, "[t]he general rule is that a creditor has a right to urge payment of a *just debt*, and to threaten to resort to *proper legal procedure* to enforce the obligation. Hence, the creditor is not liable for a mental or emotional disturbance, or for a bodily injury or illness, as a result of his mere attempt, by reasonable means, to collect." *Moorhead v. J.C. Penney Co., 555 S.W.2d 713, 718 (Tenn. 1977)* (emphasis added). Nevertheless, "improper methods used to collect a debt may be the basis for the maintenance of an action for a mental or emotional disturbance produced thereby, or for a bodily injury or illness resulting from such mental or emotional disturbance, especially where [*19] the circumstances attending the effort to collect the claim are such as to invoke the general rule that one who wilfully or intentionally causes great emotional distress, *without justification*, is liable for such injuries." *Id.* (emphasis added).

MacDermid leans heavily on *Moorhead* to argue that his claim should have survived dismissal. In that case, a married couple maintained a charge account with defendant J.C. Penney Company. *555 S.W.2d at 714*. Upon returning a piece of merchandise, the couple was assured that they would receive a credit in the sum of $ 16.78, and yet their next monthly statement included a charge, not a credit, for $ 16.78. *Id*. The couple repeatedly called J.C. Penney to point out the error, and yet they continued to receive, on an almost daily basis, threatening letters from Penney and from Penney's collection agency demanding payment. *Id. at 714-15*. In all, the couple received forty-two threatening letters and numerous abusive phone calls, some threatening lawsuit and others falsely impugning the husband's financial reputation. *Id. at 715*. In finding that J.C. Penney's conduct constituted outrageous [*20] conduct, the Tennessee Supreme Court found particularly galling the fact that the letters and phone calls had "continued long after defendant had acknowledged that its accounts were in error and that plaintiffs owed it nothing." *Id. at 717*. The court also "regarded as significant" several other factors in the case: (1) the long duration of J.C. Penney's conduct, which was alleged to have persisted for over one year; (2) the volume of threatening letters; and (3) the threats to "deliberately injure the plaintiff's credit reputation" and "jeopardize their job security." *Id*. Much like in *Moorhead*, MacDermid argues that in this case "it is difficult to conceive of any justification for a creditor's threat to pursue the jailing of a mentally ill person if either she or her husband failed to pay the debt." Appellant's Br. at 22.

[**8] The problem with MacDermid's reliance on *Moorhead*, however, is that there the creditor was clearly

without justification in pursuing collection of the debt. In fact, there was no debt at all, but rather a credit. In the instant case, in contrast, even Mr. MacDermid admits that Discover had a right--at least initially--to pursue [*21] payment of the charges that Mrs. MacDermid had accrued. He simply alleges that they went too far in their efforts, by threatening criminal penalties for a purely civil debt, by threatening in the manner they did even when put on notice of Mrs. MacDermid's condition, and by holding him jointly liable for the debts even though he was wholly unaware of what his wife had done. This places the instant case more squarely in the realm of cases in which a defendant creditor or collection agency was either justified in collecting the debt or at least appeared to have a reasonable excuse--such as a delay in the mails or a computer error in bookkeeping--for why it continued to pursue collection of the debt. *See, e.g.*, *Potts v. First Peoples Bank of Jefferson County, No. 03A01-9303-CV-00116, 1993 Tenn. App. LEXIS 489, 1993 WL 276858 (Tenn. Ct. App. July 22, 1993)* (unreported); *Patterson v. Prof'l Adjustment Serv., Inc., 544 S.W.2d 617, 620-21 (Tenn. Ct. App. 1976)* (dismissing plaintiff's outrageous complaint for failure to state a claim even though defendant attempted to collect a small balance "through harassment, coercion, and intimidation"); *Medlin, 217 Tenn. at 479-80, 398 S.W.2d at 274-75* [*22] (dismissing plaintiff's outrageous conduct complaint even though mortgage lender mistakenly sent two notices of foreclosure and was "abusive and insulting" to plaintiffs over the telephone).

Although *Moorhead* does not provide MacDermid with the firm footing he might have hoped, his claim has another, stronger leg to stand on. Namely, because his complaint alleges false threats by Discover employees of *criminal* prosecution--i.e., words to the effect of, "if you don't pay up I'll have the district attorney take a little trip to your house"--his case may be distinguished from most of the Tennessee authorities regarding creditors' attempts to collect a debt, justified or unjustified. Discover maintains that criminal prosecution of Mrs. MacDermid was warranted because "in his Complaint, Plaintiff admits that Decedent committed credit card fraud by unlawfully submitting Plaintiff's personal information to obtain the credit cards from Discover via the internet." Appellee's Br. at 22. Yet a wife's submission of her husband's name and social security number to obtain a credit card (which appears to have been all that was required in this instance), even if she does so without his permission, [*23] does not necessarily constitute fraud. It would seem that something beyond the pleadings is required for Discover to show that Mrs. MacDermid had in fact committed fraud against the company--for example, via a copy of the on-line application and an explanation of the material misrepresentations contained therein. Alternatively, if Discover is somehow alleging that Mrs. MacDermid committed fraud on her *husband* as opposed to the company, then we do not see how Discover could reasonably suggest to Mr. MacDermid that criminal fraud charges would be pursued against Mrs. MacDermid on his behalf, unless of course he had consented to such action. [1]

> 1 At oral argument, counsel for Mr. MacDermid vociferously denied having *admitted* that Mrs. MacDermid's application for a credit card over the internet, using her husband as co-obligor, was a criminal offense. We side with the Appellant on this issue, and find Discover's suggestion--both in its brief and at oral argument--that Mrs. MacDermid was *per se* criminally liable for credit card fraud to be not only premature given the 12(b)(6) stage of the proceedings, but also quite likely erroneous. It is our understanding from the limited record on this point that at most, Mr. MacDermid called Discover when he initially found out about what his wife had done, at which point he was asked if he wanted to pursue a fraud allegation (e.g., by filling out the proper affidavit), and he then *specifically declined* to pursue such action. *See* Joint App'x at 451-53 (containing copies of the affidavit that Discover sent to Mr. MacDermid, but that he never filled out at all, let alone signed).

[*24] To be sure, Tennessee's outrageous conduct standard, as in many states, is a formidable one. "To qualify as outrageous, conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly [i]ntolerable in a civilized community.'" *Doe 1 v. Roman Catholic Diocese of Nashville, 154 S.W.3d 22, 39 (Tenn. 2005)* (quoting *Medlin, 398 S.W.2d at 274*). "[T]he outrageousness requirement is an 'exacting [**9] standard' which provides the primary 'safeguard' against fraudulent and trivial claims." *Id.* (quoting *Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn. 1999))*. Nevertheless, given the allegations in Mr. MacDermid's complaint, and given the fact that we must construe them liberally and in a light favorable to the plaintiff, we

reverse the magistrate judge's 12(b)(6) dismissal of MacDermid's outrageous conduct claims and remand for further proceedings.

*(ii) Violation of the Tennessee Consumer Protection Act*

The Tennessee Consumer Protection Act ("TCPA"), *Tenn. Code Ann. § 47-18-101 et seq.*, serves in part **[*25]** "[t]o protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within [Tennessee]." *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc., 45 S.W.3d 588, 609 (Tenn. Ct. App. 2001)* (quoting *Tenn. Code Ann. § 47-18-102(2)*). In his complaint, Mr. MacDermid asserted that Discover's "practice of soliciting, and processing, purported binding credit applications by the Internet, with no mechanism for obtaining a signature of all purported obligors," causes "confusion and deception to the consumer" and is an "inherently deceptive practice" in violation of Tennessee law. In its motion to dismiss, Discover countered that its application method is expressly permitted by the Tennessee Uniform Electronic Transactions Act, *Tenn. Code Ann. § 47-10-101 et seq.*, and the federal Electronic Signatures in Global and National Commerce Act, *15 U.S.C. § 7001 et seq.* Because the TCPA does not apply to "[a]cts or transactions required or specifically authorized under the laws administered **[*26]** by, or rules and regulations promulgated by, any regulatory bodies or officers acting under the authority of this state or of the United States," *Tenn. Code Ann. § 47-18-11(a)(1)*, Discover reasoned that it should not apply to a case where, as here, the company's internet application process expressly complied with both state and federal law.

On appeal, Mr. MacDermid does little to rebut Discover's argument as to this claim. Indeed, nothing on the face of his complaint suggests that Discover's internet application process ran afoul of the state and federal laws governing such transactions. His conclusory allegation that the application process is "inherently deceptive" is not enough to survive 12(b)(6) dismissal. *See Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005)* ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."). MacDermid also appears to insert in his brief a different allegation from that appearing in his complaint -- namely, that it was not merely Discover's *deceptive* conduct, but also its *threatening* conduct, that violated the TCPA. Regardless of the merits of this **[*27]** new argument, however, it comes too late. MacDermid cannot at this stage in the litigation add new allegations to his complaint, especially when he has not properly sought leave to amend the complaint as to this particular allegation. *See, e.g., Harvey v. Great Seneca Fin. Corp., 453 F.3d 324, 328 (6th Cir. 2006)* ("The appropriate method for adding new factual allegations to a complaint is not via an appellate brief, but by filing an amended complaint.").

We therefore affirm magistrate judge's 12(b)(6) dismissal of MacDermid's TCPA claim.

*(iii) Violation of the Federal Truth in Lending Act*

The federal Truth in Lending Act ("TILA") aims to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *15 U.S.C. § 1601(a)*. MacDermid alleges in his complaint that Discover's "efforts to impose civil liability" on him, as well as its "statement[s] to merchants and other persons affirming the validity of the debt, **[*28]** " violated TILA because he "never signed, or reviewed, any application which contained the federally mandated disclosures." The magistrate judge quickly dismissed this TILA claim because MacDermid "aver[red] that he did not **[**10]** apply for, accept, authorize, or utilize the credit card." Mag. J. Op., 9/20/2004, at 23. Accordingly, the judge reasoned, he was not properly a "consumer" under TILA--and thus unable to avail himself of any private cause of action under TILA--because he was not party to the credit transaction.

MacDermid now maintains that because he was treated by Discover as a "debtor" on the basis of his wife's credit card action, he must therefore also be a "consumer" under TILA and afforded all of its protections. Even if MacDermid is correct, however, his argument asks too much, and he provides not a single case to support it. To be sure, TILA requires credit card providers to disclose information--such as terms and conditions, fees, and annual percentage rates--to the "*person* to whom the credit is to be extended." *15 U.S.C. § 1637(a)* (emphasis added). These disclosures must be made at various times: at the point of application or

solicitation [*29] for the credit card, *15 U.S.C. § 1637(c)*; at the point of account opening, *15 U.S.C. § 1637(a)*; at the end-point of each billing cycle, *15 U.S.C. § 1637(b)*; and at the point of card renewal, *15 U.S.C. § 1637(d)*.

Although it appears from the record that the on-line application listed Mr. MacDermid as the primary cardholder and Mrs. MacDermid as an authorized buyer, Joint App'x at 503, the exact contours of their contractual obligations to Discover (whether individually or as a couple) remain somewhat unclear to us, at least at this stage in the proceedings. Regardless of the exact scenario, however, nothing in TILA would seem to require a credit card company to investigate the legitimacy of an *address* provided in an application, especially where the two people listed on the application are presumed--and in this case, indeed are--members of the same household. We cannot expect Discover to have known that Mrs. MacDermid had schemed, unbeknownst to her husband, to create a post-office box to which the credit card (and disclosures) were to be sent. Mr. MacDermid certainly makes no allegation [*30] that the proper disclosures were not sent to this post-office box. He simply alleges that Discover violated TILA because he did not personally receive the proper disclosures. Unfortunately, this argument--that Discover violated TILA because it could not divine his *actual* address--finds no support in any law that we can discover. 2

> 2  This is not to deny that credit card providers' current practice of issuing cards through on-line applications may well be overly aggressive, and their efforts to screen out "risky" applicants overly lax. Indeed, given Mrs. MacDermid's poor credit history--she had recently emerged from personal bankruptcy, *see* MacDermid Aff., 2/28/2006, at 1--she would likely have been unable to be approved for a credit card without putting her husband's name on the application. While Mr. MacDermid may well be justifiably angered by the predatory practices of many credit card providers, however, his anger in this case cannot be properly addressed (or assuaged) via a Truth in Lending Act claim.

[*31] We therefore affirm the magistrate judge's 12(b)(6) dismissal of Mr. MacDermid's TILA claim. 3

> 3  Discover further notes that even if MacDermid could properly state a claim against it under the TILA, this claim would be time-barred. *See also* Mag. J. Op., 9/20/2004 at 23 n.7. The TILA provides for a one-year statute of limitations. *15 U.S.C. § 1640(e)* ("Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."). Mrs. MacDermid actually obtained the Discover credit cards in August and September of 2002. If this is the date from which the one-year clock is to start ticking, then it would appear that the TILA claims, filed on October 9, 2003, are time-barred. On the other hand, Mr. MacDermid's TILA claim is premised on the notion that he could not have been aware that he had not received the proper disclosures until such time as he found out about his wife's deception. This does not appear to have occurred until February 14, 2003, when he intercepted checks sent to his residence by Discover, and after confronting to his wife began to figure out what she had done. Joint App'x at 505. And using this later date to start the limitations clock, Mr. MacDermid's claim would clearly *not* be time-barred. However, because the statute-of-limitations issue is not particularly well-developed (the magistrate judge relegated it to a footnote, Discover mentions it in an "assuming arguendo" paragraph at the end of its TILA argument section, and MacDermid says nothing about it at all) nor is it necessary in our resolution of the TILA claim, we decline to decide it.

[*32] [**11] *(iv) Violation of the Federal Fair Debt Collection Practices Act*

The purpose of the Fair Debt Collection Practices Act ("FDCPA") is "to eliminate abusive debt collection practices by debt collectors." *15 U.S.C. § 1692(e)*. The term "debt collector" has a particular meaning, however: it refers only to persons attempting to collect debts due "another." *See id. § 1692(a)(6)* ("The term 'debt collector' means any person who . . . regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."); *see also Stafford v. Cross Country Bank, 262 F. Supp. 2d 776, 794 (W.D. Ky. 2003)* (considering it "well-settled" that "a creditor is not a debt collector for the purposes of the FDCPA and

creditors are not subject to the FDCPA when collecting their accounts").

Based on the FDCPA definition, Discover is clearly not a "debt collector"; rather, it is the very party to whom the debt is due. On appeal, Mr. MacDermid asserts that his FDCPA claim should at least be allowed to proceed to discovery so that the "exact structure and relationship" of the Discover "representatives" may [*33] be determined. This argument strikes us as logically incoherent. Even if discovery were to reveal that the persons alleged to have engaged in "outrageous conduct" in the collection of the MacDermids' debt were *not* Discover employees, but rather employees of some third-party collection company, that would not change the fact that neither Discover nor its employees are "debt collectors" under the FDCPA. MacDermid could theoretically maintain an FDCPA action against these yet unnamed third-party collectors, but any FDCPA action against Discover would still be properly dismissed. (And MacDermid should probably be careful what he wishes for: after all, if it were determined that Discover's employees were not in fact on the other end of the phone line, then most of his more colorable claims--such as wrongful death and intentional infliction of emotional distress--would not be against Discover, but against the third-party collector. MacDermid's only hope against Discover on these facts would then be on a theory of *respondeat superior* liability.)

We therefore affirm the magistrate judge's 12(b)(6) dismissal of MacDermid's FDCPA claim.

**B. Claims Dismissed on Summary Judgment (Wrongful [*34] Death Claim)**

Mr. MacDermid's wrongful death claim was premised on a theory of negligence. [4] In its motion for summary judgment as to this claim, Discover argued not only that it owed no duty of care to Mrs. MacDermid, but more importantly, that Mrs. MacDermid's suicide constituted an "intervening cause" serving to cut off any reasonably foreseeable link between Discover's actions and her untimely death. Discover supported its motion with excerpts and exhibits from the deposition of Mr. MacDermid, and with Mrs. MacDermid's medical records. Mr. MacDermid challenged Discover's "intervening cause" defense, relying largely on case law and the affidavit--excerpted in the facts section above--of Dr. John Koomen, Mrs. MacDermid's treating psychiatrist in the months preceding her death. [5]

4 *See MacDermid, 2006 U.S. Dist. LEXIS 30413, 2006 WL 1454743, at \*6 n.4* ("While Plaintiff never specifically mentions 'negligence' in his Complaint, he clearly seeks to recover for the wrongful death of his wife. Because Plaintiff never avers in his Complaint that Defendant intentionally killed decedent, his wrongful death claim must be based upon a theory of negligence. Plaintiff's Response to the instant Motion for Summary Judgment . . . does not dispute the fact that this claim is based upon negligence.").

[*35]

5 Interestingly, Dr. Koomen first began seeing Mrs. MacDermid on March 3, 2003, i.e., soon after the credit card problems were revealed. Koomen Aff., 2/28/2006, at 1. However, nothing in the record explains why Dr. Koomen began seeing her at this time, even though she had been in continuous counseling with other doctors prior to the precipitating event. MacDermid Aff., 2/28/2006, at 1. This is not to cast doubt on Dr. Koomen's affidavit or his professional skills, and there may well be a perfectly good explanation for the change in therapists. Nevertheless, without the testimony of the prior therapists, it is difficult to get a handle on Mrs. MacDermid's "baseline" mental state.

[**12] In Tennessee, "[o]ne of the rules of law that will relieve a negligent actor from liability is the doctrine of independent intervening cause." *Rains v. Bend of the River, 124 S.W.3d 580, 593 (Tenn. Ct. App. 2003)*. This doctrine is "premised on the concept that the independent intervening cause breaks the chain of legal causation between the original negligent actor's conduct and the eventual [*36] injury." *Id*. And as the *Rains* court noted, foreseeability is the touchstone of the independent intervening cause inquiry, because "no person is expected to protect against harms from events that he or she cannot reasonably anticipate or foresee or which are so unlikely to occur that the risk, although recognizable, would commonly be disregarded." *Id* . This renders the inquiry one of proximate cause, which is nothing more than a fancy word by which courts establish, often through simple common sense, a "boundary of legal liability." *Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993)*; *see also White v. Lawrence, 975 S.W.2d 525, 529 (Tenn. 1998)* (noting that proximate cause determinations are "based on considerations of logic, common sense, policy, precedent and our more or less inadequately expressed

ideas of what justice demands or of what is administratively possible and convenient" (internal quotations omitted)).

Tennessee courts have also "consistently recognized" that suicide properly constitutes an independent intervening cause in most wrongful death actions. *Rains, 124 S.W.3d at 593* (collecting cases). There are **[*37]** three exceptions to this general rule, however: (1) where defendant's negligence causes "delirium" or "insanity" that results in self-destructive acts; (2) where defendant is the decedent's custodian, and defendant knows or has reason to know that the decedent might engage in self-destructive acts; (3) where defendant and decedent have a legally recognized "special relationship," such as a physician-patient relationship, and defendant knows or has reason to know that the decedent might engage in self-destructive acts. *Id. at 593-94*. Here, nothing on the record indicates that Discover and Mrs. MacDermid had either a "custodial" or a "special" relationship; rather, the two were engaged in nothing more than a routine business transaction. Mr. MacDermid concedes as much, and thus his arguments necessarily focus on the first exception listed above. These arguments were unavailing before the magistrate judge, who reasoned as follows:

> There is simply no medical proof in this case to show that Defendant's conduct caused a delirium or insanity in decedent. Dr. Koomen's Affidavit says nothing about "delirium," or "insanity." Despite Plaintiff's statement to the contrary, **[*38]** there is simply nothing in Dr. Koomen's Affidavit to support the proposition that Defendant's threats of prosecution and jail "caused a significant deterioration in [Plaintiff's] rational thought process." Likewise, there is nothing in Dr. Koomen's Affidavit showing that decedent was rendered "bereft of reason."

*MacDermid, 2006 U.S. Dist. LEXIS 30413, 2006 WL 1454743, at *7* (brackets in original). The magistrate judge further noted that "there is absolutely no expert medical proof that decedent's suicide was a reasonably foreseeable result of any act or omission of Defendant." *2006 U.S. Dist. LEXIS 30413, [WL] at *9*.

The magistrate judge reached the correct result in granting summary judgment in favor of Discover. The delirium/insanity exception to the general rule in Tennessee that suicide constitutes an independent intervening cause in a wrongful death action appears to be extremely limited in application -- so limited, in fact, that Mr. MacDermid is unable to cite to a single case in which this particular exception was applied in a *plaintiff's* favor. To the contrary, all of the relevant Tennessee cases appear to cut in favor of defendants. As the Supreme Court of Tennessee has stated: "The best use that **[*39]** can be made of the authorities on proximate cause is merely to furnish illustrations of situations which judicious men upon careful consideration have adjudged to be on one side of the line or the other." *Lancaster v. Montesi, 216 Tenn. 50, 390 S.W.2d 217, 221 (Tenn. 1965)* (internal citations and quotation marks omitted). Based on these illustrations, we cannot conclude that Mr. MacDermid's wrongful death action should survive summary judgment.

**[**13]** In *Lancaster* itself, for example, defendant Montesi was alleged to have caused the suicide of Margaret Lancaster by "dominating and controlling" her to her ultimate breaking point. *Id. at 219*. Lancaster was married to another man but was having an affair with Montesi, who allegedly inflicted on her punishment "of the most sadistic type": in particular, Montesi allegedly broke her leg, burned her with a cigarette, and beat her repeatedly to the point of bruising and discoloration all over her body. *Id*. Whenever Lancaster attempted to escape from Montesi's control, such as by fleeing to another state, he would track her down and forcibly bring her back to his home. *Id*. It was even alleged that on one **[*40]** of these occasions in which she was being "reeled in" by Montesi she attempted to commit suicide by jumping from the moving car in which they were traveling. Thus, it would seem under the facts as alleged, that Montesi was clearly on notice of Lancaster's intention to commit suicide if he persisted in treating her as he did. *Id*. (noting that Lancaster had "called a mutual friend, and in the presence of the defendant, related the abuse imposed upon her, and stated that she was going to 'end it all'"). Nevertheless, Montesi persisted to the point where Lancaster took her life by jumping of the Memphis-Arkansas bridge. *Id*. Immediately prior to taking this action, Lancaster left a note saying: "Ma Ma, I'm sorry. Louis [Montesi] has beat me enough." *Id*. The Supreme Court of Tennessee dismissed the Lancaster family's wrongful death action against Montesi, noting that "[a]lthough it is alleged that she was 'bereft of reason,' it cannot be said that she did not know and

understand the nature of her act." *Id. at 222*. The court further held that "if the suicide is during a lucid interval, when [s]he is in full command of [her] faculties but [her] life has become unendurable **[*41]** to [her], it is agreed that [her] voluntary choice is an abnormal thing, which supersedes the defendant's liability." *Id.* (quoting Prosser on Torts § 49 (1955 ed.)).

The distinction drawn in *Lancaster*, harsh as it may appear, followed from an earlier Tennessee Supreme Court opinion which held that a defendant, who falsely and mistakenly accused an eighteen-year old boy "of good standing and reputation" of breaking into his house and stealing money from him, was not liable for causing the boy to hang himself. *Jones v. Stewart, 183 Tenn. 176, 191 S.W.2d 439, 439 (Tenn. 1946)*. The court held: "An act of suicide *resulting from a moderately intelligent power of choice*, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues." *Id. at 440* (quoting *Daniels v. New York, New Haven & Hartford R.R. Co., 183 Mass. 393, 67 N.E. 424, 426 (Mass. 1903))* (emphasis added).

Lest anyone think that Tennessee's proximate cause analysis in suicide cases has softened significantly over time, both *Lancaster* and *Jones* were cited with approval in *Potts v. First Peoples Bank of Jefferson County, No. 03A01-9303-CV-00116, 1993 Tenn. App. LEXIS 489, 1993 WL 276858 (Tenn. Ct. App. July 22, 1993)* **[*42]** (unreported). *Potts*, interestingly enough, involved facts quite similar to those in the instant case. Potts was the executrix of the estate of Ruel Reese, who committed suicide after learning that his daughter had forged his signature to draw money from his bank account and enter into various loan transactions and refinancings with him as guarantor. *1993 Tenn. App. LEXIS 489, [WL] at *1*. The amount of money involved was approximately $5,000 in checks and $17,000 in loans. *Id*. After Reese's daughter became delinquent in her loan payments by eight or nine months, the bank instituted collection proceedings against Reese because he was guarantor of the loan. *Id*. The bank allegedly told him that they would "take his house" if he did not make good on the debt. *Id*. Upon learning of the money he owed and of his daughter's deception, Reese became depressed and, although he sought psychological help, ultimately committed suicide about a year later. *Id*. In granting summary judgment in favor of the bank upon Potts's action for wrongful death, the Tennessee Court of Appeals **[*43]** held that "the record shows Mr. Reese understood the nature of his act of suicide and his act *resulted from a moderately intelligent power of choice*." *1993 Tenn. App. LEXIS 489, [WL] at *3* (emphasis added); *see also id.* ("Dr. Engum, Mrs. Potts's expert, testified there was no question that Mr. Reese intended to end his life and he understood what would be the result of shooting himself.").

If the facts of *Potts*, *Jones*, and especially *Lancaster* (the physical abuse case) do not fit the delirium/insanity exception to the independent-intervening-cause rule, then neither do the facts in **[**14]** the instant case. Particularly in light of the cogency of Mrs. MacDermid's suicide letter, the apparent lucidity of her consultation with Dr. Koomen, and the fact that even her husband did not suspect that she would be driven to suicide, we would be straining to conclude that Mrs. MacDermid's suicide did not result from a "moderately intelligent power of choice" as construed under Tennessee law, even taking into account her documented bipolar disorder condition. Even if this panel were to disagree with the parsimonious way in which Tennessee law cuts off liability in suicide cases, it is not our **[*44]** place to depart from Tennessee precedent in a case applying state substantive law. Accordingly, the magistrate judge's grant of summary judgment in favor of Discover is affirmed.

III

For all of the reasons stated above, we **AFFIRM in part** and **REVERSE in part** the decision of the magistrate judge below. We **REMAND** the intentional infliction of emotional distress claim for further proceedings. We note that our reversal is predicated on a simple alleged fact: that Discover threatened *criminal* prosecution, without a proper basis, to collect a purely *civil* debt. [6] Our ruling should therefore not be read as an indictment of credit card companies' lending practices in general. It may well be true that credit card applications--and in particular, on-line credit card applications--are too lightly regulated. For example, maybe it should be more difficult for an applicant to subject a co-signator to substantial debt liability (as appears to have happened here) without express authorization from the co-signator. As the system currently stands, all that is required is an internet connection and knowledge of the co-signator's name, social security number, and address. Likewise, **[*45]** maybe it should take more than just the click of a mouse

for an individual who has recently emerged from personal bankruptcy, and who has a mental disorder that manifests itself in bouts of excessive spending on exotic pussycats, to be able to obtain a credit card in the first place. But as potentially troublesome as we might find some of these practices, they do not, in this case, constitute grounds for legal liability against Discover.

6   We recognize, however, that this is not the only theory MacDermid is entitled to pursue during discovery. Under the notice pleading standard, MacDermid has broadly claimed that Discover's actions constituted outrageous conduct, and our ruling today allows him to pursue this claim further without necessarily limiting it to the threat of criminal prosecution. (In his complaint, for example, MacDermid also alleges that Discover's conduct was outrageous under Tennessee law because the company continued to employ harassing techniques against his wife to collect the debt even after he advised it of her history of mental illness.)

[*46]