LEXSEE 2007 US APP LEXIS 16829

**RONNIE WALKER, Plaintiff-Appellant, v. OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, and LINDA S. THOMAS, Warden, Defendants-Appellees.**

**No. 06-3900**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**07a0490n.06;** *2007 U.S. App. LEXIS 16829*; *2007 FED App. 0490N (6th Cir.)*

**July 11, 2007, Filed**

**NOTICE:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY: [*1]**
ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.
*Walker v. Ohio Dep't of Rehab. & Corr., 2006 U.S. Dist. LEXIS 29774 (N.D. Ohio, May 16, 2006)*

**COUNSEL:** For RONNIE WALKER, Plaintiff - Appellant: David J. Kovach, Licata & Associates, Independence, OH.

For OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS, Defendant - Appellee: Joseph N. Rosenthal, Columbus, OH; Pooja A. Bird, Timothy A. Lecklider, Office of the Attorney General, Columbus, OH.

For LORAIN CORRECTIONAL INSTITUTION, LINDA S. THOMAS, Warden, Defendants - Appellees: Joseph N. Rosenthal, Columbus, OH; Timothy A. Lecklider, Office of the Attorney General, Columbus, OH.

**JUDGES:** BEFORE: COLE and McKEAGUE, Circuit Judges; and COHN, District Judge. [*]

[*] Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

**OPINION BY:** McKEAGUE

**OPINION**

**McKEAGUE, Circuit Judge.** Correction Officer Ronnie Walker was discharged from employment after assaulting an inmate. Without denying that the assault took place, Walker, who is African-American, contends his discharge was motivated by race discrimination and points to examples of comparable white employees who engaged in similar misconduct but were not discharged. The district court awarded summary judgment to defendants on Walker's Title VII and *§ 1983* [*2] claims, finding that the asserted comparable employees were not similar in all relevant respects and that, therefore, Walker had failed to make out a prima facie case of race discrimination. Finding the district court's opinion to be well-reasoned and free of error, we affirm.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Ronnie Walker was hired by the Ohio Department of Rehabilitation and Correction ("Department") in September 1995. From then until the date of his termination on December 13, 2001, he served as a correction officer at the Lorain Correctional Institution. His termination was precipitated by an

2007 U.S. App. LEXIS 16829, *2; 2007 FED App. 0490N (6th Cir.)

altercation he had with an inmate, Craig Thomas, on October 14, 2001. Some of the details of the altercation are disputed, but the differences are not material.

Craig Thomas, an African-American inmate, was serving a life term for aggravated murder. On October 14, 2001, he and his cellmate, Rashee Ambler, were about to be returned to punitive segregation because Walker had just discovered contraband (potato chips) in their cell. The inmates were not happy about this. Words were exchanged and, according to Walker, Thomas challenged him by spitting in his face. Walker responded by **[*3]** "punching" or "smacking" Thomas in the face. Walker dep., JA 684-85. Then, according to Walker, both men threw several punches, some of which connected, before they were separated by two other correction officers. As officers were leading Thomas away in handcuffs, he called Walker a "sucker ass nigger" and Walker "smacked him in the back of his head." *Id.,* JA 689.

Correction Officer ("CO") Bud Anderson, who, along with CO Richard Jackson, had been summoned to escort the inmates to segregation, tells a somewhat different story. When he and Jackson arrived at the room where Thomas and Ambler were waiting, he found Thomas and Walker engaged in a verbal confrontation. As "Thomas sat quietly, looking ahead," Anderson reported, Walker, "with a clenched fist struck Thomas in the front facial area." Anderson aff., JA 54-55. As Anderson restrained Walker and then attempted to place handcuffs on Thomas, "Walker rushed forward to strike him again in the front facial area." *Id.,* JA 55. With Jackson's help, Anderson managed to remove Walker from the area. He then cuffed Thomas and proceeded to escort him away, when "Walker again came up from behind striking Thomas in the back of the head or neck." **[*4]** *Id.*

This incident led to an investigation resulting in a detailed nine-page investigation report, dated October 19, 2001, by Institutional Investigator Christopher J. Monyak. JA 318. In his report, Monyak summarized Walker's version of the incident in a manner consistent with the above summary, but noted inconsistencies in Walker's statements given in three separate interviews. JA 319-20.

Monyak received a statement from Walker's partner, CO Lori Lanier-Robinson, to the effect that she heard Thomas threaten Walker and heard the sound of someone spitting just before Anderson and Jackson arrived. She

was then occupied helping CO David Grasha restrain Ambler. She observed Walker strike Thomas in the back of the head as he was led away in handcuffs. Monyak noted discrepancies in Lanier-Robinson's account and that she refused to take a "CVSA Test (Computer Voice Stress Analyzer)" to prove that she was telling the truth. JA 321-22.

Monyak received a statement from Anderson consistent with his above-summarized affidavit. Anderson observed Walker strike Thomas twice in the face without apparent provocation or retaliation from Thomas. JA 322. Even after Anderson placed himself between Walker and **[*5]** Thomas, "Walker kept trying to get close enough to hit Thomas again." *Id.* Anderson reported seeing Walker strike Thomas a third time, in the back of the head as officers escorted him away in cuffs. Anderson said Thomas "never said a word prior to being struck" this third time. *Id.*

Lieutenant Roger Wright told Monyak he saw Walker strike Thomas in the back of the head as he was escorted away. He reported that Thomas "did nothing to provoke Walker, nor did he respond in any way." JA 323. Monyak recorded that "the Lieutenant couldn't believe what he had just witnessed." *Id.*

Monyak also took statements from inmates Ambler and Thomas. Their version was essentially consistent with that of Anderson. JA 323-24 They both characterized Walker as the unprovoked aggressor. They both believed that Walker's assault was motivated by a desire to intimidate or punish Thomas because he had witnessed Ambler and Lanier-Robinson engaged in a sex act.

In conclusion, Monyak found Walker and Lanier-Robinson to be not credible. He summarized his conclusion as follows:

> The evidence that Walker assaulted inmate Thomas is overwhelming. Walker's only defense to his actions is that he was reacting to being spit in **[*6]** the face. There is no evidence other than Walker's and Lanier-Robinson's testimony, that the inmate even spit at Walker. Lanier-Robinson claimed she did not see the spitting incident, but she did hear it. Walker's own statement indicates that he struck Thomas immediately after being

2007 U.S. App. LEXIS 16829, *6; 2007 FED App. 0490N (6th Cir.)

spit on. If this were true, the yard officers [Anderson and Jackson] would have been able to substantiate Walker's allegation. The amount of force used by Walker was excessive by any measure.

JA 325.

After Warden Linda S. Thomas reviewed Monyak's report and related exhibits, she referred the matter to a hearing officer for a pre-disciplinary conference. L. Thomas aff. P 7, JA 123. Hearing Officer Mindy Williams produced a report concluding there was just cause for discipline. *Id.* After review of all relevant incident reports and written statements, Warden Thomas concurred in Monyak's assessment that the statements of Anderson and Jackson, as well as the statements of inmates Ambler and Thomas were more credible than Walker's and Lanier-Robinson's conflicting version of the incident. *Id.* at P 8, JA 123. She concluded that inmate Thomas did not offer resistance to Walker's blows to his face. *Id.* In addition, **[*7]** she observed that Walker's slapping of the handcuffed Thomas in view of other inmates could have precipitated a riot situation. *Id.* Warden Thomas made the decision to terminate Walker for physical abuse of an inmate, a violation of Rule 43 of the Standards of Employee Conduct--a violation for which the only disciplinary action permitted is removal. *Id.*

Notice of disciplinary action, terminating Walker's employment effective December 13, 2001, was issued by Warden Thomas on November 30, 2001, and approved by the Department Director on December 10, 2001. JA 211. "Physical abuse" is one of four rule violations cited as the basis for the discipline. The charge of physical abuse was deemed substantiated by findings that Walker attempted to bait Thomas into fighting him, and then punched him twice in the face and once in the back of the head. *Id.* [1]

> 1  In addition, Walker was subject to criminal prosecution for the assault in the local municipal court. Although he was originally charged with misdemeanor assault, he entered into a plea agreement whereby he pleaded guilty to disorderly conduct. This was accomplished even before Walker's termination became effective. Walker dep., JA 703-04.

Walker **[*8]** commenced this action in the Northern

District of Ohio on December 2, 2003, filing a two-count complaint against the Ohio Department of Rehabilitation and Correction and Warden Thomas alleging defendants discriminated against him based on race. JA 7. In count I, Walker seeks damages from the the Department under *42 U.S.C. §§ 2000e et seq.* (Title VII), and *42 U.S.C. § 1981.* In count II, Walker proceeds against Warden Thomas under *42 U.S.C. § 1983*, seeking reinstatement and injunctive relief prohibiting future discriminatory or retaliatory treatment.

After completion of discovery, defendants moved for summary judgment on Walker's claims. Lacking direct evidence of race discrimination, Walker attempted to make his case based on circumstantial evidence purportedly giving rise to an inference of discriminatory animus. While Walker has not denied that he assaulted Thomas or that his conduct makes out a removable violation, he contends that similarly situated white correction officers received less harsh treatment. The district court granted defendants' motion for summary judgment on May 16, 2006. In a ten-page opinion, the court explained that none of the comparable white correction officers **[*9]** was situated similarly to Walker in all relevant respects. The asserted circumstantial evidence was deemed not to give rise to an inference of race discrimination and Walker was held to have failed to make out a prima facie case of discrimination. This appeal followed.

## II. ANALYSIS

### A. Summary Judgment Standard

The court of appeals reviews *de novo* an order granting summary judgment. *Johnson v. Karnes, 398 F.3d 868, 873 (6th Cir. 2005).* Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id.* Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Leadbetter v. Gilley, 385 F.3d 683, 689-90 (6th Cir. 2005).* A dispute is "genuine" only if based on evidence upon which a reasonable **[*10]** jury could return a

Case: 1:06-cv-01532-SL  Doc #: 45-13  Filed: 07/26/07  4 of 7.  PageID #: 813

Page 4

2007 U.S. App. LEXIS 16829, *10; 2007 FED App. 0490N (6th Cir.)

verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 451 (6th Cir. 2004)*. A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id.*

## B. Race Discrimination - Prima Facie Case

The district court correctly ruled that Walker's claim against the Department of Rehabilitation and Correction under *42 U.S.C. § 1981* is barred by the State's *Eleventh Amendment* immunity. *See Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999)* ("*§ 1981* claims against ODRC are barred by the *Eleventh Amendment*"); *Johnson v. University of Cincinnati, 215 F.3d 561, 571 (6th Cir. 2000)* (same). Walker does not challenge this ruling.

The district court also correctly recognized that Walker's race discrimination claims against the Department under Title VII and against Warden Thomas under *42 U.S.C. § 1983* are governed by the same substantive standards. *See Smith v. City of Salem, Ohio, 378 F.3d 566, 577 (6th Cir. 2004)*; *Lautermilch v. Findlay City Schs., 314 F.3d 271, 275 (6th Cir. 2003)*. As plaintiff has failed to adduce any direct evidence of race discrimination, he attempts, **[*11]** under these governing standards, to establish the essential elements of his prima facie case by circumstantial evidence: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position he held; and (4) that he was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006)*. Walker has undisputedly satisfied the first three elements of the prima facie case. The district court found the record evidence insufficient, however, to satisfy the fourth element. Walker now contends the district employed a too rigid standard, requiring the asserted comparable employees to be similarly situated *in all respects* in order to be deemed probative of discrimination.

The district court, relying on *Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir. 1992)*, required that the comparables be "similarly situated in all respects." Opinion p. 4, JA 16. To be "similarly situated," the district court held, "the individuals with whom Walker seeks to compare his treatment must have dealt with the same supervisor, **[*12]** been subject to the same standards and engaged in the same conduct without such

differentiating or mitigating circumstances that would distinguish their conduct or the ODRC's treatment of them for it." *Id.* at 4-5, JA 16-17. Yet, the district court also correctly recognized that this standard is not comprised of "inflexible" criteria. The court expressly acknowledged the importance of "making an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.* at 5, JA 17 (quoting *Seay v. TVA, 339 F.3d 454, 480 (6th Cir. 2003)*, and *Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998)*).

### 1. *CO Anthony Weeda*

First, the court considered the example of CO Anthony Weeda, a white officer who, in October 1999, may have used unnecessary force in pushing a handcuffed inmate to the floor. The only discipline he received was a written reprimand. JA 247. Weeda had handcuffed inmate Frazier after Frazier had, using curse words, twice refused Weeda's direct orders to leave the area. Use of Force Committee Report, JA 248. Weeda claimed that Frazier slipped and fell on a wet **[*13]** floor while he escorted him away. *Id.* An inmate witness reported seeing Weeda deliberately push the inmate against the wall and throw him to the floor. *Id.* The resulting investigation of the incident determined that Weeda's version was not credible. *Id.,* JA 249-50. Warden Gary R. Croft reprimanded Weeda not for excessive force or physical abuse of an inmate, but for using poor judgment by taking inmate Frazier into an isolated area. JA 247.

The district court determined that Weeda had not been shown to be similarly situated for two reasons: he was under the direction of a different supervisor; and he was subject to disciplinary standards different from the one under which Walker was disciplined, which went into effect two years after the Weeda incident. Opinion pp. 5-6, JA 17-18. Citing the very case now relied on by Walker, *Seay, 339 F.3d at 479*, the court acknowledged that although "similarly situated employees," to be comparable, ordinarily must have dealt with the same supervisor, this is not an inflexible requirement. The district court went on to correctly determine, however, that in circumstances such as these, where the court is asked to compare impositions of discretionary **[*14]** discipline in response to fact-specific abuses of authority, the identity of the supervisor is surely a relevant

consideration. Here, the importance of the "different supervisor" factor is magnified where discipline was imposed for what nominally was a much less serious violation (i.e., poor judgment), under different disciplinary standards, for alleged abusive conduct that, even if believed, was of a significantly less serious nature than that perpetrated by Walker, and that was witnessed only be inmates whose credibility was suspect.

It is Walker's burden to prove that Weeda's employment situation was in relevant respects "nearly identical" to his own. *Id. at 479.* The district court did not err in concluding that Walker failed to present even a genuine issue of fact as to whether Weeda was similarly situated. There are simply too many differences between the two situations to warrant a reasonable inference that the difference in discipline each received is attributable to race discrimination.

### 2. *Captain Dana Darling*

Second, the district court considered an incident of abuse that occurred in May 1998. This incident is evidenced by two Use of Force Committee Reports. JA 77-91; JA 268-73. **[*15]** Neither report affords a complete picture of the incident. What is clear is that numerous officers participated in prolonged, violent efforts to subdue and restrain a combative inmate, Anthony Secession, and that excessive force was used. When Secession was finally subdued, he needed medical attention. Although several officers were involved, Walker focuses on Captain Dana Darling, who is white, the on-duty shift supervisor, as having been similarly situated. There is no indication that Darling was directly involved in restraining Secession. Rather, the Use of Force Committee preliminarily determined that Darling was at fault for having exercised poor judgment by allowing two officers who had been involved in forcefully restraining Secession to then transport him to the infirmary, where they further abused him. JA 269. There is no evidence that Darling witnessed, authorized or approved the abuse; he erred by not taking appropriate steps to prevent it. Darling was disciplined for his misfeasance in the form of a demotion from Captain to correction officer. According to Walker, the demotion lasted only three months. Walker dep., JA 706.

The district court concluded that Darling was not **[*16]** similarly situated because he answered to a supervisor other than Warden Thomas and was himself a supervisory officer, not a front line correction officer.

These distinctions are indisputably relevant. Moreover, Darling's exercise of poor judgment, which exposed an inmate to further physical abuse by subordinate officers, is vastly different misconduct than that committed by Walker. Under these circumstances, considering the dissimilarities between the two situations, the differences in discipline meted out to Darling and Walker cannot reasonably be deemed to give rise to an inference of race discrimination. The district court did not err in concluding that Darling was not similarly situated.

### 3. *CO William Flesch*

Third, the district court considered the example of CO William Flesch, a white correction officer who had been under defendant Warden Thomas's supervision when he injured an inmate in May 2002. Flesch was in the process of restraining a resisting but handcuffed inmate, McDaniel. Believing that McDaniel was about to spit at him, Flesch spun McDaniel around and took him to the floor. Monyak Investigation Report, JA 71-74. As his head struck the floor, McDaniel sustained a cut **[*17]** near his left eyebrow that required stitches. *Id.* The Use of Force Committee concluded that Flesch's use of force was unjustified and excessive. JA 259. Institutional Investigator Monyak also investigated the matter. He disagreed with the committee's conclusion and recommended against imposing discipline for assault. Monyak Report, JA 74. He noted that McDaniel was verbally and physically resisting Flesch. At worst, Monyak concluded, the facts showed a failure by Flesch to protect McDaniel as he avoided being spat upon. *Id.* Warden Thomas rejected the committee's conclusion and approved Monyak's recommendation. Flesch was not disciplined.

The district court characterized Flesch as "closer" to being a similarly situated non-minority employee. That he was subject to the direction and supervision of Warden Thomas, the same supervisor as Walker, is a circumstance that certainly makes comparison of the discipline received by him more probative than the discipline received by Weeda and Darling. However, in comparison to Walker's case, the district court found the evidence against Flesch to be weaker and the excess force employed by Flesch to be less serious. Opinion p. 7, JA 19. The distinction **[*18]** was aptly drawn in Monyak's report: "The type of force used by Officer Flesch clearly does not rise to the level of an assault (such as an intentional punch to the face)." JA 74. Indeed, the

2007 U.S. App. LEXIS 16829, *18; 2007 FED App. 0490N (6th Cir.)

culpability of the officers' wrongdoing cannot be measured simply by the seriousness of any resulting injury to the inmate. Whereas in Flesch's case, inmate McDaniel incidentally sustained injury as Flesch forcefully subdued him, inmate Thomas's injuries were sustained as a direct result of intentional and clearly unjustified blows delivered by Walker. That Walker was more severely disciplined than Flesch stands to reason. The nature of each officer's misconduct is too dissimilar to justify any inference that Warden Thomas's differential treatment of them reflects racially discriminatory animus.

### 4. *CO David Carleton*

CO David Carleton, a white correction officer, is the most similarly situated of the proffered comparables. In December 2001, he was found to have twice struck a handcuffed inmate, once in the stomach and once in the face. Use of Force Committee Report, JA 251-53. The committee recognized that inmate Kadras had refused to comply with two orders to exit the area before Carleton took it **[*19]** upon himself to escort Kadras to the segregation unit. *Id.* Although Carleton claimed that Kadras continued resisting, the committee found Carleton's act of punching Kadras in the stomach unjustified. Later, as Carleton continued escorting Kadras, Kadras began walking erratically, wandering from side to side on the walkway in spite of Carleton's orders to walk forward. Carleton directed Kadras to walk straight ahead by striking him on the side of the face or head. The committee found some degree of force was justified to guide Kadras, but that striking him in the face was excessive. *Id. See also* Monyak Report, JA 241-44. Warden Thomas determined that Carleton had committed several violations, including physical abuse of an inmate. She directed that he be discharged, effective March 11, 2002. JA 212. Carleton challenged his termination by filing a grievance, which was eventually submitted to arbitration. On August 14, 2002, the arbitrator issued a Bench Decision and Award, ruling that Carleton's termination was not for just cause. JA 213. Carleton was reinstated effective August 25, 2002, subject to a "last chance agreement" ordered by the arbitrator and signed by Carleton, a union representative, **[*20]** and a representative of the Department. JA 214. All lost time was converted to administrative leave without pay.

The district court concluded that Carleton was, in the circumstances of his termination, similarly situated to Walker. Opinion p. 8, JA 20. Carleton was subject to

supervision by the same warden, violated the same rule by physically abusing an inmate, engaged in arguably similar misconduct, and was consequently discharged from employment. Yet, because Carleton was so similarly situated--having received the same discipline from the same supervisor for the same sort of misconduct--his case offers no support for the claim that race discrimination played a role in Warden Thomas's decision to terminate Walker. In fact, Carleton's case actually refutes Walker's claim, demonstrating that Warden Thomas, in two decisions approved by the Department, imposed the same discipline upon similarly situated employees, irrespective of their skin color. Hence, Carleton's case was correctly deemed not to give rise to an inference of discrimination, because he was not treated by Thomas or the Department any less harshly or more favorably than Walker. *Id.*

Walker contends the more favorable treatment **[*21]** consists of Carleton's reinstatement. Yet, as the district court observed, Carleton's reinstatement was not Warden Thomas's decision. Thomas aff. P 10, JA 123-24. She imposed consistent discipline. Carleton's reinstatement was the product not of Thomas's decision nor of any other Department official's decision, but of an arbitrator's award pursuant to the collective bargaining agreement's grievance procedure. As such, Carleton's reinstatement by arbitration award hardly evidences discrimination by Warden Thomas or the Department. Because the more favorable treatment received by Carleton was not attributable to either defendant, the district court properly concluded that Carleton was not similarly situated to Walker in the circumstances of his reinstatement.

Walker contends, however, that Carleton's reinstatement was ordered by the arbitrator only after the Department withdrew its opposition to the grievance. Indeed, there is support for the proposition that the award was premised on the parties' mid-arbitration settlement agreement. Carleton dep. p. 11, JA 386. According to, Carleton, Department officials made a settlement proposal after hearing his witnesses testify to the effect that **[*22]** the warden's decision to discharge him was contrary to the Use of Force Committee's recommendation. *Id.* at 12, JA 387. Yet, Walker contends, when he asked for a similar accommodation from the Department prior to arbitration of his grievance, the Department declined. Mabe dep. p. 22, JA 419.

So, it is the Department's refusal to settle Walker's

2007 U.S. App. LEXIS 16829, *22; 2007 FED App. 0490N (6th Cir.)

grievance like it settled Carleton's that is said to evidence race discrimination. Again, such an inference is reasonably justified only if Carleton and Walker were similarly situated in all relevant respects. It is Walker's burden to show by a preponderance of the evidence that his situation and Carleton's, vis-a-vis reinstatement, were "nearly identical." *Seay, 339 F.3d at 479*. This showing has clearly not been made.

Although the record is sketchy, it appears that Warden Thomas's decision to terminate Carleton was contrary to the recommendation of the Use of Force Committee. The Use of Force Committee concluded that, because inmate Kadras was resisting, some use of force was justified, but the force used by Carleton was excessive. JA 251-53. The committee's assessment is essentially corroborated by Investigator Monyak's report. JA 241-44. The **[*23]** committee's report does not include a disciplinary recommendation. Accepting Carleton's testimony as true, as we must for purposes of summary judgment review, it appears from testimony given by a committee member to the arbitrator that the committee recommended some form of discipline less than termination. JA 387. By discharging Carleton, Warden Thomas went beyond the committee's recommendation. It was only after Department officials were confronted with this testimony that they produced their settlement proposal, which culminated in the arbitrator's ruling that Carleton "was not terminated for just cause." JA 213.

The Use of Force Committee did not investigate Walker's use of force in the altercation with inmate Thomas. However, Warden Thomas's decision to discharge Walker appears to have been entirely consistent with Monyak's investigation assessment. Monyak concluded, based on the statements of several correction officer witnesses, that "the evidence that Walker assaulted inmate Thomas is overwhelming" and that "the amount of force used by Walker was excessive by any measure." JA 325. The decision also appears to have been consistent with the Pre-disciplinary Conference Hearing **[*24]** Officer's Report concluding there was just cause for discipline. Thomas aff. P 7, JA 123. Moreover, in contrast to Carleton's situation, where inmate Kadras was found to have been resisting officers' orders, Warden Thomas specifically found that "inmate Thomas did not offer resistance" to Walker. *Id.* at P 8, JA 123. In other words, whereas Carleton erred by using excessive force where use of some force was deemed justified, Walker

was found--by overwhelming evidence provided largely by fellow correction officers--to have assaulted inmate Thomas repeatedly without justification. Further, defendants represent that Walker's grievance, like Carleton's, was taken to arbitration; but unlike Carleton's, Walker's grievance was denied. Finally, unlike Carleton, Walker has provided no evidence of favorable testimony presented in arbitration that ought to have engendered receptivity to his plea for reinstatement.

In sum, it is apparent that Carleton's and Walker's reinstatement situations were not nearly identical. Although both had been discharged by the same warden for similar misconduct, there are several distinguishing circumstances that plausibly explain why Carleton's request for reinstatement **[*25]** was granted and Walker's denied. That is, even assuming Carleton's reinstatement was facilitated by the Department's consent, and was not simply the product of the arbitrator's award, Walker has, on the present record, clearly failed to show that his situation was so similar to Carleton's in all relevant respects as to warrant the inference that denial of his request for reinstatement was motivated by race discrimination. Because Carleton and Walker were not similarly situated in the circumstances under which one was reinstated and one was not, evidence of Carleton's reinstatement offers no valid support for Walker's prima facie case. The district court did not err, therefore, in concluding that Carleton was not similarly situated in all relevant respects.

## III. CONCLUSION

Having thus considered all the comparables evidence proffered by Walker and finding, like the district court, that none of it gives rise to a reasonable inference of race discrimination, we uphold the district court's ruling. Walker failed to present evidence sufficient to create a genuine issue of material fact in support of his prima facie case. Considering the record as a whole--demonstrating that Walker struck an **[*26]** inmate in the face and head three times, without justification, conduct for which he pleaded guilty to a reduced-charge misdemeanor--we find the notion that a reasonable jury could find that Walker's discharge was not justified, but was the product of race discrimination, simply implausible. Accordingly, the district court's award of summary judgment in favor of the defendants is **AFFIRMED.**